**Homer F. and Dorothy L. McMURRAY, Petitioners, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

**Homer F. and Dorothy L. McMURRAY, Petitioners, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

**Nos. 92–1513, 92–1628.**

United States Court of Appeals, First Circuit.

Heard Dec. 8, 1992.

Feb. 9, 1993.

Aline H. Lotter, Manchester, NH, for petitioners, appellants.

Gary R. Allen with whom James A. Bruton, Acting Asst. Atty. Gen., Tax Div., Dept. of Justice, Bruce R. Ellisen, Washington, DC, and William J. Patton, Pittsburgh, PA, and Abraham N.M. Shashy, Jr., Dallas, TX, were on brief, for respondent, appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

In these consolidated appeals, Dorothy L. McMurray and Homer F. McMurray ("the McMurrays"), challenge decisions of the United States Tax Court which upheld determinations made by the Commissioner of Internal Revenue ("the Commissioner") that the McMurrays are jointly liable for income tax deficiencies for 1984 through 1988, as well as penalties stemming from those deficiencies. The deficiencies are based on the Commissioner's conclusion that the McMurrays overstated the value of certain charitable land donations. For the reasons that follow, we affirm the deficiency determinations, but reverse a portion of the penalty assessments.

## I.

### Background

The central issue in this case is the amount of charitable deduction to which the McMurrays are entitled as a result of donating property known as the Ponemah Bog,[1] in Amherst, New Hampshire ("the Bog"), to the Audubon Society of New Hampshire ("Audubon"). The McMurrays, who are husband and wife, in 1954 ac-

---

**1.** Ponemah is a "kettle hole" bog, formed by glaciers over 12,000 years ago. As the climate warmed and the glaciers receded, vegetation grew on the edges of a pond formed by the melting blocks of ice. Although the pond was too deep and steep-sided to support the growth of many types of marsh plants, some, such as sphagnum (peat) moss, were able to grow out over the edge of the pond and float on the surface. Eventually, a peat mat formed on the surface, which became thick enough to support shrubs and stunted trees. Over the course of thousands of years, the pond gradually filled with peat and the remains of dead vegetation.

quired the approximately 72–acre Bog and other contiguous parcels of land.

In February 1978, Audubon solicited from the McMurrays[2] a donation of the Bog, in order to ensure its perpetual preservation. The McMurrays agreed, and in 1979, 1982 and 1985 conveyed their interests in the Bog and an abutting residential lot to the Audubon Society in four separate transactions. Only the value of the 1982 and two 1985 conveyances are at issue in this case.

In 1979, the McMurrays conveyed the eastern 24.6 acres of the Bog to Audubon. In April 1982, the McMurrays conveyed a 65 percent interest in the remaining 47.57 acres of the Bog. On their joint federal income tax return for 1982, the McMurrays claimed that the fair market value of their contribution to Audubon was $780,000. They based this valuation on a "letter of opinion" from appraiser Patricia J. Donovon, who concluded that the fair market value of the property was $25,000 to $27,000 per acre, or between $750,000 and $800,000. The McMurrays took a $118,981 deduction on the 1982 return, and calculated that $349,019 would be carried over to future years.

In September 1985, after carrying over deductions of $122,458 and $117,721, respectively, on their 1983 and 1984 returns, the McMurrays conveyed to Audubon the remaining 35 percent interest in the Bog. In December 1985, they transferred a one acre residential lot abutting the Bog. In March 1986, Donovon provided the McMurrays with an appraisal for the two 1985 donations. Donovon increased the price per acre to $35,000, and concluded that the 35 percent interest in the Bog had a value of $580,000. She valued the residential lot at $55,000 to $60,000, resulting in a total 1985 charitable conveyance value of $635,000 to $640,000.

On their 1985 return, the McMurrays claimed a value of $637,500 for the donated property. They used the remaining $123,200 carryover from the 1982 donation, and claimed $10,636 from the 1985 transfers on their 1985 return, leaving a $371,864 carryover. The McMurrays claimed deductions of $170,597 in 1986, $135,115 in 1987, and $76,788 in 1988.

Upon conducting an examination of the McMurrays' returns for 1984, 1985 and 1986, the Commissioner determined that the fair market value of the 1982 conveyance was $23,200, rather than $780,000, as the McMurrays claimed. Accordingly, the Commissioner ruled that there was no carryover from 1982 to either 1983 or 1984, and thus no deduction allowable for 1984. The Commissioner also ruled that the fair market value of the 1985 Bog transfer was $6,250, as opposed to the $580,000 the McMurrays claimed; and that the value of the residential lot transferred the same year was $35,000 rather than $57,500, as claimed by the McMurrays. Based on these figures, the Commissioner determined that the McMurrays were entitled to a 1985 deduction of $24,750, and that no carryovers were available for future years. Thus, the Commissioner found deficiencies for 1984, 1985 and 1986. The Commissioner also asserted additions to tax under I.R.C. § 6653 for negligence and intentional disregard of rules and regulations, and under I.R.C. § 6659 for underpayment of tax attributable to a charitable valuation overstatement. The Commissioner subsequently determined tax deficiencies for 1987 and 1988, as well as additions to tax under sections 6653 and 6659.[3]

---

2. The record indicates that Homer F. McMurray was the principal actor in all Bog-related transactions. However, because their joint-taxpayer status places both McMurrays before us, we refer to all actions as though they were done jointly.

3. The deficiencies and additions to tax determined by the Commissioner and upheld by the Tax Court are as follows:

| Year | Def. | Sec. 6653 (a)(1) | Sec. 6653 (a)(2) | Sec. 6653 (a)(1)(A) | Sec. 6653 (a)(1)(B) | Sec. 6659 |
|------|------|------|------|------|------|------|
| 1984 | $65,327 | $3,266 | * | – | – | $19,598 |
| 1985 | $53,552 | $2,676 | * | – | – | $16,058 |
| 1986 | $85,176 | – | – | $4,259 | * | $25,553 |

In March 1990, the McMurrays filed a petition in the tax court seeking a redetermination of the 1984, 1985, and 1986 deficiencies. On March 19, 1992, the tax court ruled against the McMurrays (Appeal No. 92–1513). Meanwhile, in March 1991, the McMurrays had sought redetermination of their 1987 and 1988 deficiencies. The Commissioner filed a motion for summary judgment in the 1991–filed case, claiming that the McMurrays were collaterally estopped by the decision in the 1990 case from relitigating the 1985 contributions. On April 23, 1992, the tax court granted the Commissioner's motion for summary judgment (Appeal No. 92–1628). These appeals followed.[4]

## II.

### Discussion

#### A. The Deficiencies

■ Section 170 of the Internal Revenue Code ("the Code") allows taxpayers to deduct charitable contributions subject to percentage-of-income limitations and to carryover excess contributions. If a charitable contribution is made of property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution. Treas.Reg. § 1.170A–1(c)(1). Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having a reasonable knowledge of relevant facts." Treas.Reg. § 1.170A–1(c)(2). The Commissioner's determination of the fair market value of donated property is presumptively correct, and the taxpayer has the burden of proving the Commissioner's determination to be erroneous. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Pescosolido v. Commissioner*, 883 F.2d 187, 189 (1st Cir.1989). The fair market value of property is a reflection of the "highest and best use" of the property on the date of valuation. *Symington v. Commissioner*, 87 T.C. 892, 896 (1986); *Stanley Works v. Commissioner*, 87 T.C. 389, 400 (1986). The tax court's ruling with respect to fair market value is a factual finding that we must affirm unless it is clearly erroneous. *Sammons v. Commissioner*, 838 F.2d 330, 333 (9th Cir.1988); *Ebben v. Commissioner*, 783 F.2d 906, 909 (9th Cir. 1986).

■ Here, both sides agree the highest and best use of the Bog is as a natural preserve. The McMurrays, however, believe the commercial value of the peat contained in the Bog should be taken into account in any valuation.[5] In support of their theory, the McMurrays submitted to the tax court appraisals by Boston College Coastal Research Institute Professor Dr. Benno Brenninkmeyer, Richard Kasevich, chief financial officer of a Maine peat-mining operation, and botany professor Ian Worley.[6] Brenninkmeyer estimated the value of the peat in the Bog, as a fuel resource, to be greater than $35 million; Worley calculated the profit potential of harvesting the peat; Kasevich compiled a *pro forma* income statement demonstrating the profitability of a hypothetical harvesting operation on the Bog.

Before the tax court, the Commissioner relied exclusively for the valuation of the gift on the appraisal of Joseph G. Fremeau.

| Year | Def. | Sec. 6653 (a)(1) | Sec. 6653 (a)(2) | Sec. 6653 (a)(1)(A) | Sec. 6653 (a)(1)(B) | Sec. 6659 |
|---|---|---|---|---|---|---|
| 1987 | $50,539 | – | – | $2,527 | * | $15,162 |
| 1988 | $22,981 | – | – | $1,149 | * | $ 6,894 |

\* penalty assessed is 50 percent of the interest due on the deficiency.

4. In their reply brief, the McMurrays indicate their abandonment of the collateral estoppel issue. Thus, our decision here will apply to both cases.

5. According to record evidence, peat can be used as a fuel source for electric power generation.

6. Although the Tax Court considered the Donovon appraisals accompanying the McMurrays' tax returns as part of the peat valuation theory, it is evident from the record that the McMurrays essentially abandoned reliance on Donovon before the Tax Court and included her appraisal only as part of their argument against penalties, *see infra*. Thus, for purposes of our examination of the peat valuation evidence, we discuss neither Donovon's work, nor the Tax Court's criticism thereof.

After giving much weight to the presence of state and local zoning restrictions on the use of the Bog, and interviewing several people involved in the variance and permitting process, Fremeau opined that any request for a permit to harvest the peat or otherwise develop the Bog would have met substantial opposition during the relevant time period and would have had little chance of success. Accordingly, Fremeau's valuation focused on sale prices of eight other supposedly comparable wetland properties suitable for conservation purposes and which had sold at prices between $200 and $800 per acre. Fremeau concluded that the Bog had a value of $400 per acre, for a total of $12,500 for the 1982 transfer, and $6,700 for the 1985 transfer. With respect to the residential lot, Fremeau evaluated 20 comparable sales and found a range in the Amherst area of $22,533 to $58,000. As the lot in question is smaller than many other Amherst house lots and is encumbered by a right-of-way easement owned by Audubon, Fremeau's $35,000 valuation fell toward the lower end of the scale.

In the end, the tax court found · the McMurrays' evidence inadequate because, unlike Fremeau, none of their experts took into account the restrictions on harvesting the peat or the costs associated with such an operation. Thus, the court concluded that the McMurrays failed to carry their burden of proving that the value of the Bog exceeded the Commissioner's determination. Based on our review of pertinent case law, we cannot say the tax court's ruling was clearly erroneous.

█ It is well settled that legal restrictions on development or other encumbrances diminish a property's fair market value. For example, in *Great Northern Nekoosa Corp. v. United States*, 711 F.2d 473 (1st Cir.1983), a taxpayer donated a parcel of land to the State of Maine for which he claimed a fair market value of $1 million based on his expert's valuation of the property as a site for a hydroelectric power plant. Prior to the donation, however, the National Wild and Scenic Rivers Act, 82 Stat. 906 (1968), was enacted, which could have barred, *inter alia*, such construction, a fact not considered by the taxpayer's appraisal. We concluded that the taxpayer's valuation could not be the fair market value "inasmuch as any rational prospective purchase would necessarily take into account the potential realization of that encumbrance." *Id.* at 475. Therefore—despite our less than complete satisfaction with the Commissioner's expert appraisal—we concluded that the taxpayer failed to bear its burden of proving a valuation higher than that of the Commissioner.

Here, too, we have a taxpayer appraisal that fails to consider potential legal obstacles toward fulfilling the property's full monetary potential. Moreover, as the Commissioner points out, the McMurrays' experts also failed to consider many other aspects of a peat mining operation in arriving at their conclusion.[7] Thus, given the shortcomings of the McMurrays' experts' reports, the tax court's conclusion that the McMurrays failed to carry their burden was not clearly erroneous.

█ In the alternative, the McMurrays argue that if state and local regulatory constraints deprive them of the Bog's economic potential, then they are entitled to just compensation under the United States Constitution in return for a regulatory tak-

---

7. For example, Brenninkmeyer reached his $35 million conclusion by multiplying the Bog's estimated volume by $145 per ton, which was the average retail price of coal in 1989. He failed, however, to assess the market for peat during the relevant time period, or the costs and feasibility of a complete peat extraction. Kasevich's income statement was based on the 1990 peat harvesting figures of his own company, but did not include any potential overhead costs. Worley, relying on Kasevich's income statement, assumed, without factual support, that all equipment could be purchased outright, and thus did not consider financing costs. Significantly, both Kasevich and Worley alluded to the fact that successes in the peat harvesting business were few, and that most of the peat harvesting operations of which they were aware had failed. While Kasevich's Down East Peat Co. was an apparent exception, we cannot quarrel with the Tax Court's conclusion that reliance on Down East's financial performance to estimate the McMurray's potential success is "like saying that anybody opens a hamburger chain and you estimate the profit potential by what McDonald's does."

ing. *See Lucas v. South Carolina Coastal Council,* ── U.S. ──, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Even assuming that *Lucas* would turn the regulations involved here into a "taking," the short answer is that the McMurrays have overlooked the fact that any such "taking" was performed by state and local authorities, and as such gives them no right to seek compensation—via tax deductions—from the United States, an entirely different sovereign. Moreover, to the extent that the McMurrays argue for including the value of an inverse condemnation suit against the State of New Hampshire in the Bog valuation, the tax court correctly concluded that the success of such a suit is not as assured as the McMurrays declare, and that the record is "devoid of any evidence directed toward valuing any such claim." Thus we find the tax court did not err in rejecting this argument.

■ Finally, the McMurrays argue that the tax court's reliance on Fremeau's use of comparative sales to value the Bog was inappropriate due to the Bog's uniqueness. Instead, the McMurrays, relying on *Estate of Palmer v. Commissioner,* 839 F.2d 420 (8th Cir.1988), assert that the Bog's replacement cost would be a better method. We disagree. The McMurrays, unlike the taxpayers in *Palmer,* have provided no evidence of replacement cost and thus we find no clear error in the tax court's reliance on Fremeau's evaluation method.[8] Accordingly, we affirm the tax court's decision to uphold the Commissioner's deficiency determinations.[9]

---

**8.** While it is true that Fremeau's comparative properties were not identical to the Bog in some respects, the Tax Court found that they were the most comparable for the relevant time and place. *See Symington,* 87 T.C. at 900 (in the absence of identical properties, comparable sales method takes into account differences, and through appropriate adjustment, arrives at a value for the subject property). As the record demonstrates that the compared properties were also non-developable wetlands, and that state Fish and Game and Forest Protection Society personnel held at least two of the properties in the same high esteem as the Bog, we find the Tax Court's endorsement of Fremeau's methodology eminently supportable. *See Anselmo v. Commissioner,* 757 F.2d 1208, 1213 (11th Cir.

## B. Additions to Tax and Penalties

### 1. Negligence

■ Section 6653(a)(1) of the 1954 Code and Section 6653(a)(1)(A) of the 1986 Code impose an addition to tax of five percent of an income tax underpayment where any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) of the 1954 Code and Section 6653(a)(1)(B) of the 1986 Code impose a penalty of 50 percent of the interest due on the portion of any underpayment attributable to negligence.[10] Negligence in this context is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Allen v. Commissioner,* 925 F.2d 348, 353 (9th Cir.1991). The Commissioner's imposition of a negligence addition is presumptively correct, leaving the McMurrays with the burden of proving that their underpayment was not due to negligent or intentional rules violations. *Leuhsler v. Commissioner,* 963 F.2d 907, 910 (6th Cir.1992).

■ The McMurrays argue, as they did below, that their good faith reliance on Donovon—a professional real estate appraiser—for the valuations stated on their 1982 and 1985 returns justifies reversal of the extra assessment. The tax court, however, found that the McMurrays did not sufficiently establish that they reasonably relied on Donovon's appraisals, "beyond the bare fact that the [ ] appraisals were attached to the [ ] returns." The court then combined four factors—its disparag-

---

1985) (Tax Court's determination of proper comparable market is a question of fact subject to reversal only if clearly erroneous).

**9.** The McMurrays have not addressed any appellate argument to the valuation of the residential lot transferred in 1985. Therefore, we deem the argument abandoned. *See, e.g., United States v. Slade,* 980 F.2d 27, 30, n. 3 (1st Cir.1992).

**10.** The relevant statutes were renumbered for taxable years in which a return is due after December 31, 1986. Their substance remained the same, however. *See* Tax Reform Act of 1986, Pub.L. No. 99–514, § 1503(a), 100 Stat. 2085.

ing view of Donovon's report, the McMurrays' failure to testify as to their reliance, their abandonment of her appraisals at trial, and evidence of the McMurrays' knowledge of real estate development in the Amherst area—to conclude that they had failed to demonstrate their reasonable reliance. We disagree.[11]

 Reasonable reliance on expert opinion, asserted in good faith, can shield a taxpayer from section 6653(a) penalties. *United States v. Boyle,* 469 U.S. 241, 250, 105 S.Ct. 687, 692, 83 L.Ed.2d 622 (1985); *Collins v. Commissioner,* 857 F.2d 1383, 1386 (9th Cir.1988); *Betson v. Commissioner,* 802 F.2d 365, 372 (9th Cir.1986). The record reflects that after being approached by Audubon, the McMurrays sought professional advice from lawyers and accountants, as well as an appraiser. In our view, the "bare fact" that the McMurrays attached Donovon's appraisals to support their 1982 and 1985 returns *is* evidence of their reliance on the appraisals. In other words, why else were they submitted with the returns, but for the fact that the McMurrays were relying on them? Furthermore, we fail to see how any of the other factors cited by the tax court are probative of the McMurrays' reliance. For instance, the fact that the McMurrays pursued a different legal tack at trial in 1991 has little bearing on the reasonableness of their actions in 1982 and 1985. Also, while the McMurrays may have some knowledge as to "real estate development," the record evidence of such knowledge falls far short of requiring them to second-guess a licensed appraiser—especially one whose 1979 appraisal apparently passed muster with the Commissioner as support for the deductions taken for the 1979 conveyance. Finally, we note that the minimal probative value assigned by the tax court to the McMurrays' expert opinion does not mandate a finding of bad faith or unreasonable reliance. *See Sammons,* 838 F.2d at 337 (although taxpayer's expert appraisal was

not entitled to any probative weight in determining the fair market value of a charitable contribution, imposing a negligence penalty was inappropriate because taxpayers had no reason to question their expert's ability) (*citing Biagiotti v. Commissioner,* 52 T.C.M. (CCH) 588, 595 (1986)). We conclude, therefore, that the record lacks sufficient evidence of bad faith to support the tax court's negligence ruling, and instead compels a finding that the McMurrays met their burden of proof on this issue.

### 2. Valuation Overstatement

 Section 6659 of the Code imposes an addition to tax if the amount of any underpayment of $1,000 or more is attributable to a valuation overstatement of charitable deduction property.[12] For purposes of this section, a valuation overstatement exists where the claimed value is 150 percent or more of the amount determined to be correct. I.R.C. § 6659(c)(1). Here, the McMurrays claimed a donation value of $803,933 in 1982, and a value of $637,500 in 1985. The tax court, however, ruled that the values were $12,500 and $41,700, respectively. These figures place the McMurrays' overstatement beyond the 150 percent threshold of section 6659.

The McMurrays seek relief under section 6659(e), which allows for a waiver of "all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith." While we have already concluded that the McMurrays acted in reasonable reliance on the Donovon appraisal, the inquiry does not end there, because section 6659(f)(2) prohibits a penalty waiver unless "the claimed value of the property was based on a qualified appraisal made by a qualified appraiser," *and,* "in addition to obtaining such an appraisal, the taxpayer made a good faith investigation of the val-

---

11. It is unclear from the record whether the Tax Court was questioning the McMurrays' actual reliance on Donovon, or whether any such reliance was reasonable. With that in mind, we will delve into both areas.

12. The assessed penalty is 30 percent of the underpayment attributable to the valuation overstatement.

**44**

ue of the contributed property." On appeal, the McMurrays do not address section 6659(f)(2), nor does our review of the record indicate any additional investigation by the McMurrays into the value of the property. Thus, we affirm the imposition of penalties under section 6659.

### III.

### *Conclusion*

The tax court's decision with respect to the Commissioner's deficiency determination and additions to tax under I.R.C. § 6659 is *affirmed.* The decision with respect to the negligence penalties under I.R.C. § 6653(a) is *reversed. This case is remanded to the Tax Court with instructions to enter a decision in accordance herewith.*