HERBERT T. COBEY, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cobey v. Commissioner
Docket No. 33161-87
United States Tax Court
T.C. Memo 1994-118; 1994 Tax Ct. Memo LEXIS 119; 67 T.C.M. (CCH) 2450; March 23, 1994, Filed *119 Decision will be entered for respondent. For petitioner: Richard R. Schaul-Yoder, David H. Ruttenberg, Robert L. Birnbaum, and Leonard Schneidman. For respondent: Michael F. Steiner. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by statutory notices of deficiency, determined Federal income tax deficiencies and additions to tax for petitioner's 1980 and 1981 taxable years as follows: Additions to Tax [1] Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(1) Sec. 6653(a)(2) 1980
$ 106,221
$ 5,311.05
--   --
1981
98,879
--   $ 4,943.95
[2]
All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The deficiencies and additions to tax for petitioner's 1980 and 1981 tax years result from respondent's disallowance of petitioner's share of partnership losses stemming from alleged straddle transactions of forward contracts for Government-backed financial securities *120 with First Western Government Securities, Inc. (First Western). The First Western losses were the subject of this Court's opinion in Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S.    , 111 S. Ct. 2631 (1991). In Freytag, the Court found that the First Western transactions were "illusory and fictitious and not bona fide". Freytag v. Commissioner, 89 T.C. at 875. The Court also held that, even if the transactions had substance, they "were entered into primarily, if not solely, for tax-avoidance purposes." Id. at 876. Petitioner has conceded that the First Western investments were sham transactions for Federal income tax purposes and that he is liable for the full amount of the deficiencies determined by respondent. The only issue for consideration is whether petitioner is liable for the additions to tax for negligence under section 6653(a). Petitioner argues that he was not negligent because (1) he relied on investment advisers regarding the bona fides of the *121 First Western transactions, and (2) he conducted his own review of First Western's investment program and failed to uncover evidence that the transactions were shams. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated by this reference. At the time of filing the petition in this case, petitioner resided in Boston, Massachusetts. Petitioner graduated from Harvard College in 1965 and from Harvard Business School in 1968. Thereafter, petitioner became a stockbroker with the investment banking and stock brokerage firm Goldman, Sachs & Co. (Goldman Sachs), where he was employed through the years in issue. In his years with Goldman Sachs, petitioner acquired significant knowledge of financial markets and investment vehicles and sold millions of dollars worth of investments to his clients. Sometime in 1980, petitioner was contacted by Edward Jepsen (Jepsen), an audit partner with Price Waterhouse, regarding investments in First Western forward contracts. Petitioner and Jepsen had been friends since their days together at Harvard Business School -- the two men frequently discussed investment opportunities, and *122 Jepsen maintained a personal brokerage account with petitioner at Goldman Sachs. Jepsen indicated to petitioner that investments with First Western would result in significant and predictable tax benefits. The tax benefits resulted from First Western's entering into transactions that would produce a loss in the current year in an amount approximating the investor's "requested" loss, followed by conversion of those losses into gains of an identical amount in a subsequent year. Jepsen indicated to petitioner that he had discussed the First Western investments with some of his Price Waterhouse colleagues, including James Kozera (Kozera), a fellow audit partner who had visited First Western offices and met with company executives. Petitioner, however, never spoke with Kozera prior to making his investment in First Western, and never directly relied on any opinion, written or oral, from Kozera regarding the bona fides of the First Western transactions. At the time petitioner spoke with Jepsen and at the time he made his investment with First Western, he did not know whether Jepsen or Kozera was an expert in forward contracts for Government mortgage-backed securities. Jepsen and Kozera *123 in fact were not experts in forward contracts for Government mortgage-backed securities or in tax matters related to such securities. Jepsen sent petitioner a First Western investment prospectus and a copy of a legal opinion from the law firm of Arvey, Hodes, Costello & Burman (the Arvey Hodes opinion) concerning the tax benefits associated with First Western forward contracts. The Arvey Hodes opinion was addressed to Sidney Samuels (Samuels), First Western's president, and contained a caveat that others were not to rely on the assessment of First Western contained therein. Additionally, the Arvey Hodes opinion stated the assumption, based on representations made by Samuels, that the First Western transactions were bona fide investments, and that the tax effects discussed therein applied only if the First Western investments were bona fide. Nevertheless, petitioner relied exclusively on the Arvey Hodes opinion, the First Western prospectus, and representations made by Jepsen in deciding to invest in First Western forward contracts. On September 29, 1980, petitioner, Jepsen, and five other individuals formed Padanaram Group Associates (PGA), a general partnership formed for the *124 purpose of investing in First Western forward contracts. Petitioner contributed $ 15,000 to PGA upon formation of the partnership. Petitioner's interest in PGA was 41.67 percent. On October 14, 1980, Jepsen, acting on behalf of the PGA partnership, executed a new account application and customer agreement with First Western. A margin deposit, computed as a percentage of the loss requested by the investor, was paid to First Western as required upon opening the account. Petitioner understood that the margin payment to First Western would enable the partnership to receive substantial losses in approximately the amounts requested. Petitioner further understood that any loss received under the First Western program would be converted into a gain of a similar amount 2 years later, resulting in significant tax savings from the 2-year deferral of income. PGA's total requested loss from First Western for 1980 was $ 360,000. The actual loss reported by PGA from First Western for 1980 was $ 384,255. On his 1980 individual tax return, petitioner reported a loss of $ 162,120 as his share of the PGA loss ($ 162,120 = 41.67 percent of $ 384,255). For 1981, PGA again requested and received *125 a loss from First Western, although no further margin payments were made; petitioner's share of the 1981 loss was $ 152,679, an amount closely approximating the loss he expected to receive. Petitioner expected the losses he received during 1980 and 1981 to be converted into gains of similar amounts in 1982 and 1983, respectively. During 1980 and 1981, petitioner never attempted to verify the First Western transactions; he merely relied on characterizations of the transactions provided in the First Western prospectus, the Arvey Hodes opinion, and representations made by Jepsen for his determination that the losses were bona fide, and thus, tax deductible. Our focus here is whether petitioner's reliance on these sources and his failure to further investigate the bona fides of the First Western transactions constitute negligence under section 6653(a). OPINION Section 6653(a) for 1980 and section 6653(a)(1) for 1981 provide for an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence. Section 6653(a)(2), which applies in this case only to the 1981 year, provides for an addition to tax equal to 50 percent of the interest *126 payable on the portion of the underpayment attributable to negligence. Negligence includes a lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner bears the burden of proving that respondent's determination of negligence is erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioner first argues that he is not liable for the additions to tax for negligence because he relied on representations made by Jepsen and Kozera regarding the bona fides of the First Western transactions. Reliance upon professional advice is not an absolute defense to negligence; it must first be established that such reliance was reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987). When an investment contains such obviously suspect tax claims that a reasonable taxpayer would realize the venture was not technically feasible, or that there was no possibility of profit, a good faith investigation of the underlying viability, financial structure, and economics *127 of the investment is required; blind reliance on professional advisers in such an instance would not be reasonable or in keeping with the standard of the ordinarily prudent person. See LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Horn v. Commissioner, 90 T.C. 908, 942 (1988). The First Western transactions proposed to petitioner in the instant case clearly required additional inquiry beyond blind reliance on professional advisers. This is especially true here where petitioner has specialized expertise in the subject matter. In Freytag v. Commissioner, supra, we held that the same First Western investment program at issue here contained "clearly sufficient gremlins that would have required a reasonably prudent person to step back and take another look." Id. at 887. Since petitioner had extensive experience as a stockbroker, including *128 experience with forward contracts and Government-backed securities -- the same types of investment vehicles at issue here -- he should have been aware that the tax benefits offered by the First Western investment were too good to be true, or at least that they deserved a second look. Petitioner admitted that tax benefits were a primary motivation for investing with First Western. Petitioner indicated that he expected to receive losses from First Western closely approximating his requested losses for 1980 and 1981, a fact which proved true both years. These losses were to be recovered as capital gains of like amounts in 1982 and 1983. Petitioner thus understood that his relatively small cash contribution to First Western's investment program would provide significant tax benefits through the program's 2-year deferral of income. Further, petitioner had little expectation that his investment with First Western was at risk -- he believed that there was only a "98-to-1" or "99-to-1" chance that he would have to make additional payments beyond his initial cash contribution -- nor could he expect nontax profits since his requested losses were to be offset by gains of identical amounts. *129 Since petitioner expected to receive tax benefits greatly in excess of his cash investment, with little risk of loss or opportunity for nontax gains, he should have been on notice that something was amiss. See Allen v. Commissioner, 92 T.C. 1, 11-12 (1989), affd. 925 F.2d 348 (9th Cir. 1991). In light of the suspect tax benefits offered by First Western and noting that petitioner was far more experienced with the investment vehicles proposed by First Western than either Jepsen or Kozera, we do not find petitioner's reliance on representations made by Jepsen or Kozera to be reasonable or in keeping with the standard of the ordinarily prudent person. [1]
*130 Petitioner's second argument is that his own review of the First Western prospectus and the Arvey Hodes opinion constituted a sufficient inquiry into the bona fides of the First Western transactions to preclude imposition of section 6653(a) negligence additions. Negligence additions may be imposed if a taxpayer fails to exercise due diligence in an investigation into the bona fides of an obviously suspect transaction. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; LaVerne v. Commissioner, supra at 652-653. In conducting such an investigation, taxpayers cannot rely solely on the offering materials or other representations supplied by the investment vendor. Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); Beck v. Commissioner, 85 T.C. 557, 572 (1985). Additionally, petitioner's education and experience as a stockbroker and investment adviser should be considered in determining whether he was negligent *131 in failing to conduct a good faith investigation of the First Western transactions. Leuhsler v. Commissioner, supra; Freytag v. Commissioner, 89 T.C. at 887-889. Petitioner's reliance on the investment prospectus and the Arvey Hodes opinion, despite the suspect tax claims mentioned above, was not supported by any attempts to verify the First Western transactions. In this regard, the instant case presents an unusual situation -- petitioner's own experience as a stockbroker and his familiarity with the types of transactions proposed by the First Western investment program make him uniquely well qualified to investigate the underlying transactions and discern their true nature, yet he failed to do so. We are surprised that petitioner chose to rely merely on promotional materials and representations of the First Western transactions made by someone with less expertise than himself. If petitioner had conducted his own good faith investigation of the underlying transactions, he would have discerned strong reasons to conclude that the transactions were not bona fide and that they were entered into primarily for tax-avoidance *132 purposes. We conclude that petitioner's failure to conduct a meaningful investigation of the First Western transactions beyond his review of the promotional materials supplied by Jepsen is negligence within the meaning of section 6653(a). Overall, petitioner's actions were not those which a reasonable and prudent person would have taken under the circumstances. Accordingly, we hold that petitioner negligently disregarded rules or regulations. Petitioner is therefore liable for the additions to tax under section 6653(a) for 1980 and section 6653(a)(1) and (2) for 1981. Decision will be entered for respondent.
Footnotes
1. There were also additions to tax under sec. 6621(c) for both years which petitioner has conceded.↩
2. 50 percent of the interest due on $ 98,879.↩
1. We do not find the holding in McMurray v. Commissioner, 985 F.2d 36 (1st Cir. 1993), affg. in part, revg. in part, and remanding T.C. Memo. 1992-27, to be controlling here. In that case, the First Circuit Court of Appeals reversed the Tax Court's imposition of negligence additions by holding that the taxpayer's reliance on a licensed real estate appraiser was reasonable as the taxpayer had no reason to "second-guess" the valuation furnished by the appraiser. Id.↩ at 43. In the instant case, however, petitioner had ample reason to question the validity and deductibility of the First Western losses, and, thus, his reliance on Jepsen and Kozera was not reasonable or in keeping with the standard of the ordinarily prudent person.