T.C. Memo. 1997-243


UNITED STATES TAX COURT


GERALD D. AND CATHERINE LEIBOWITZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3542-94.                    Filed May 29, 1997.


<u>Ronald G. Wohl</u> and <u>Robert S. Barnett</u>, for petitioners.

<u>Nicholas G. Kokis</u> and <u>Lewis J. Abrahams</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


BEGHE, <u>Judge</u>:  Respondent determined the following deficiencies and additions to tax in petitioners' Federal income taxes:

| Year | Deficiency | Addition to Tax Sec. 6659 |
|------|-----------|--------------------------|
| 1985 | $5,061 | $1,518 |
| 1986 | 6,783 | 2,035 |
| 1987 | 6,287 | 1,886 |
| 1988 | 6,118 | 1,835 |

The issues for decision are: (1) The fair market value of the movie memorabilia (the collection) donated by Gerald Leibowitz (petitioner) to the American Museum of the Moving Image (AMMI) for purposes of determining the charitable contribution deductions to which petitioners were entitled for 1985, the year of the gift, and for the later years by way of carryovers; and (2) whether petitioners are liable for additions to tax under section 6659[1] for a valuation overstatement.

We find the value of the collection to be less than petitioners claimed, but more than respondent allowed, which will result in deficiencies for 1987 and 1988. We hold that petitioners are not liable for additions to tax for a valuation overstatement.

FINDINGS OF FACT

---

[1] Unless otherwise identified, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time of filing their petition, petitioner and Catherine Leibowitz were married and resided in Fresh Meadows, New York. Petitioner has a Ph.D. in clinical psychology from the University of Rochester. In 1985, he maintained a private practice and served as chief psychologist at a handicapped children's residential center.

Petitioner's interest in movie memorabilia began in childhood, stimulated in part by his father's employment on the business side of the movie industry. Over the years, petitioner had collected a large number of 8- by 10-inch black and white still photographs. In the 1970's, petitioner began collecting print blocks, which are the metal plates used to print newspaper advertisements. At some time in the early 1980's, petitioner acquired the bulk of the collection, including all the posters, from a family friend, Robert Schwartz, who had worked for United Artists. Schwartz had assisted petitioner in collecting the print blocks. At no time in 1985 or in prior years was petitioner a dealer in movie memorabilia. Prior to donating the collection to AMMI, petitioner had never sold or otherwise disposed of any part of the collection or other movie memorabilia.

1.  The Collection

    a.  Background

    Posters and other advertising paraphernalia have been produced by movie studios since the beginning of the movie industry.  Over the years, a number of stock types evolved, most of which are represented in the collection.  Since the 1920's, the studios have produced a standard size movie poster, known as a one-sheet, for virtually every film released in movie theaters.  Even today, more widespread releases might have several one-sheets.  Up until the mid-1980's, other types of advertising were also produced for films.  With the advent of newer forms of advertising media and technology in the early 1970's, both the quantity and quality of the broad range of printed advertising materials began to decline.

    b.  Role of Physical Condition

    The physical condition of an item of movie memorabilia has always had a significant effect on its market value.  By 1985, collectors and dealers in movie memorabilia had begun to adhere to fairly standardized classifications of physical condition that had generally been borrowed from the field of comic book collecting.  With some modifications, collectors and dealers still use these basic classifications.  The most commonly used grades in 1985 were "Mint", "Fine", "Good", and "Poor".

    Mint condition posters have no tears, pieces missing, tape marks, or pinholes from being displayed, and their colors have

not faded.  The attachment of "snipes", strips of paper printed with messages such as "Return Engagement" pasted over a portion of the poster, also detracts from a poster's condition, usually lowering its classification.  Posters that have never been folded or rolled may command a premium if they are from an older or especially collectible title.  "Fine", "Good", and "Poor" posters have increasingly obvious defects that will reduce their value. Competent restoration of a damaged poster or other item of movie memorabilia may enhance its value.

### c.  Types of Movie Memorabilia

There are items in petitioner's collection from each of the following categories.

(1) One-sheet (27 by 41 inches)--generally printed on light paper stock.  The intrinsic artistic merit of one-sheets varies substantially.  Some famous titles, such as "Across the Pacific", starring Humphrey Bogart, are prized by collectors despite their poorly executed artwork because of the allure of the film or its stars.  Another example is "The Miracle Worker", a well-known film in the collection whose poster artwork is generally regarded as inferior.  On the other hand, there are many one-sheets of lesser known titles that are acknowledged to have artistic merit. Posters in either category could command considerable premium prices in 1985.

In 1985, the minimum retail store price for one-sheets was $5 to $15. At mid-1980's conventions,[2] one-sheets could be obtained in varying conditions for as little as $1 to $2. In bulk, one-sheets might have sold for as little as 10 cents each. At 1985 auctions, prices for one-sheets of highly collectible titles such as "Stagecoach", a title not in the collection, often ran as high as $2,000 or more. One-sheets for "Casablanca" were so rare and highly sought after as to have been virtually unobtainable at any price since the late 1960's.

In the pretelevision era, popular films were sometimes re-released in theaters, often with a different advertising campaign that included newly designed one-sheets. However, the one-sheet for a re-release was worth much less than a first release one-sheet for the same film. For example, in 1985, a 1944 re-release one-sheet for "Stagecoach" had a retail value of $200 to $250 compared to $2,000 for a one-sheet from the original 1939 release.

(2) Three-sheet (41 by 81 inches)--a larger poster similar in artistic composition to one-sheets, usually printed in two to three sections and folded at the time of printing. Far fewer three-sheets than one-sheets were produced for a given title. In

---

[2] Movie memorabilia conventions, described infra p. 11, were large markets sponsored several times a year in different locations around the country that functioned on both the retail and wholesale level, drawing collectors and movie memorabilia dealers.

1985, three-sheets were not widely sold and were not generally sold at conventions. Three-sheets that were sold at conventions tended to be nondescript titles in less than mint condition, selling for as little as $1 to $2. Catalogs and other price guides published in 1985 generally valued three-sheets at about 1.57 times the value of a one-sheet for the same title.

(3) Six-sheet (81 by 81 inches)--a larger poster printed in three to four sections in the same weight paper as one-sheets. The individual sections were generally folded after printing. Like three-sheets, they were not as widely available for sale as one-sheets in 1985. They were not sold at conventions. However, 1985 catalogs and price guides established a base price for most titles at about 1.8 times the price of a one-sheet for the same title.

(4) Twenty-four-sheet (324 by 81 inches)--a billboard-sized poster whose individual sections are generally folded. They were not widely sold during the mid-1980's, although one for "The Misfits", a title in the collection, was offered at auction for $600 to $800 in October 1985 without being sold. Twenty-four-sheets were not sold at conventions. On this record, no general price range for twenty-four-sheets can be established for 1985.

(5) Half-sheet (28 by 22 inches)--also known as a "display sheet", was printed on heavier stock than one-sheets. Unlike larger categories of movie memorabilia, fold marks generally detract from the value of a half-sheet. In 1985, prices of half-

sheets for most titles ranged from a low of about 65 to 70 percent to as high as 80 to 100 percent of the price of a one-sheet of the same title.

(6) Insert (14 by 36 inches)--a tall narrow poster printed on heavier stock than a one-sheet, although some were occasionally printed on lighter stock.  They were rarely produced after the mid-1960's.  Trimmed borders, folds, and creases all detract from the value of an insert.  In 1985, inserts for more desirable films, such as the "Barefoot Contessa", a title represented by a three-sheet and a six-sheet in the collection, were selling in catalogs for $40.  For most titles, 1985 prices of inserts ranged from the same price as a half-sheet (about 65 to 70 percent of a one-sheet price) to roughly the same price as a one-sheet.

(7)  Lobby card (11 by 14 inches)--a small poster printed on heavy stock featuring a scene from the film.  By the mid-1980's, studios were beginning to discontinue producing lobby cards. Prior to that period, studios usually produced lobby cards in sets of eight cards, although four- and ten-card sets were not uncommon.  In 1985, the most desirable card in the set, commanding the highest prices, was the title card, displaying the title and the top stars in the film.  The remaining lobby cards could be roughly categorized as "live" scene cards and "dead" scene cards.  Live scene cards feature a famous scene or a picture of one or more of the major stars in the film.  In 1985,

they did not command the premium price of a title card, but could still be quite valuable depending upon the title and the quality of the scene shown.  Dead scene cards, which showed background scenes, commanded the lowest prices.  Lobby card sets from lesser known films, especially ones made after 1960, were often broken up by dealers in the 1970's and early 1980's and the more desirable cards sold separately.  Lobby cards from films made after the early 1960's generally do not have as much artistic merit as older cards.

Folds and creases detract from the value of lobby cards. Many lobby cards were also trimmed by theater owners.  Without restoration, trimming greatly reduced a lobby card's 1985 value. Nevertheless, in 1985, a badly trimmed title card from a 1949 Bowery Boys film, "Hold that Baby", a title not in the collection, was listed in catalogs at $10.  The most highly prized live scene cards, such as a card from "Casablanca" that showed both Humphrey Bogart and Sidney Greenstreet, sold for as much as $600-$1,000 per card in 1985.  For most titles, however, prices of lobby card sets ranged from $19 to $25 a set in 1985.

(8) Still photograph (8 by 10 inches)--largely in black and white, although color stills were issued for later films.  In 1985, overall price ranges were difficult to establish for stills.  They were easy to reproduce and demand for them was relatively limited.  However, some stills were quite valuable in 1985.  Original stills from the 1920's and 1930's were highly

sought after because their authenticity was relatively easy to ascertain. Stills from titles released in the 1940's and early 1950's with proven provenance commanded prices of $5 to $25. However, the record contains insufficient information to establish a general price range in 1985 for the stills in the collection.

(9) Foreign poster--either from foreign films or of foreign releases of American films. There were both types in the collection, although most were French or Spanish posters of American films. Foreign posters come in three sizes: Small (16 by 21 inches), medium (23 by 31 inches), and large (47 by 62 inches).

In 1985, foreign posters of American films were generally less expensive than American first release posters for the same title, even though the artwork was different, and in many cases, superior to that of the American posters. Because they were not very widely sold in 1985, many contemporary price guides did not specifically list prices for individual foreign posters. However, foreign posters were available to at least some extent in 1985 at auction, by catalog from Cinemonde, a large retail store in San Francisco, and at retail stores in New York and other larger cities. For most titles, prices in 1985 for all three sizes of foreign poster were about 70 to 80 percent of the price of an American release one-sheet.

(10) Pressbook--materials that studios sent to the media and theaters as part of the promotional campaign for a film. In 1985, pressbooks were beginning to become desirable as collectible movie memorabilia. Post-World War II pressbooks were common and relatively inexpensive in 1985. Pressbooks for older films are more elaborate than those produced after about 1960. In 1985, pressbooks were listed separately in some of the price guides, ranging in price from 5 to 20 percent of the value of a one-sheet to $9 to $12 apiece. Pressbooks could be found for $5 apiece in many retail stores.

(11) Window Card (14 by 22 inches)--printed on hard stock with no folds. Four inches of blank space was left, usually at the top of the card, for the theater to imprint its name. Very often, the imprinting was done crudely, and sometimes not at all. Over the years, the blank space has been trimmed from many specimens. Window cards were widely sold in 1985 and listed separately in catalogs and price guides. They ranged in price from about 40 to 100 percent of the price of a one-sheet, depending upon condition.

### d. Movie Memorabilia Markets in 1985

Movie posters and other movie memorabilia began to be widely collected in the 1970's, partly spurred by a renewed interest in films starring Humphrey Bogart. The primary sources for movie memorabilia in the early days of the hobby were old theaters, movie poster exchanges, and the National Screen Service, a film

industry cooperative formed in 1942 to distribute film advertising. Much of the memorabilia then extant was purchased in bulk by collectors, many of whom later became dealers. By the late 1970's, the markets that existed in 1985 were beginning to form. As demand for movie memorabilia increased in the 1970's and early 1980's, prices for all categories rose dramatically. Prices tended to appreciate much more quickly for films of the 1930's to 1950's because much of the demand was driven by nostalgia for those "golden years" of Hollywood. From the perspective of the collector and the dealer:

> There are no "good" or "bad" movie posters. Some, of course, are aesthetically pleasing. Others are wonderful because they capture the spirit of the film they advertise. Many are desirable to collectors simply because they are tangible representations of a truly great or favorite movie. A small number are examples of superb design and/or lithography. All, however, are created "equal" in the sense that they were and are produced for the single purpose of enticing a prospective movie-goer to choose a particular film to see at a given moment. They are advertising. [Guernsey's, Comprehensive Collections of Film Posters & Lobby Cards, Illustration, Cartoons & Animation at Auction 8 (1987).]

The development of the movie memorabilia market through 1985 bore strong similarities to the earlier development of comic book collecting. Not only were some early collectors of movie memorabilia also comic book collectors, but the different movie memorabilia markets also evolved in much the same way as comic book markets--a mixture of retail stores, catalog sales, auctions, and conventions. Stamp and coin collecting are other

markets that developed prior to movie memorabilia and which share the same basic structures.

By 1985, the movie memorabilia markets had matured. Movie memorabilia were available in retail stores and through mail order catalogs. Conventions were held periodically in different parts of the country. Particularly well-known and highly sought-after posters were sold at auctions sponsored by prominent auction houses. Hitherto undiscovered treasure troves of movie memorabilia were being uncovered in flea markets, old theaters, and the like. Price guides had been available to collectors for several years. The price guides generally focused on the retail market rather than wholesale market.[3] By 1985, just like similar guides for the comic book, coin, and stamp markets, movie memorabilia price guides had become the single most important source of market information for both collectors and dealers. These guides set the de facto standards for retail prices, with wholesale prices tending to be 30 to 70 percent less. Collectors and dealers also traded memorabilia, using "trade values" pegged to prevailing retail values.

In 1985, retail stores were generally the highest priced source, although auction prices for particularly desirable material, such as posters for "Casablanca", could be much higher.

_____

[3] See _infra_ note 8 for a listing of 1985 price guides submitted into evidence.

Buyers who were not especially knowledgeable generally bought at retail stores.

Conventions catered mainly to dealers who bought on the wholesale level and to serious or knowledgeable collectors who sought the best bargains. During this period, the same individual would very often participate in the convention market as both dealer and collector. Dealers and collectors would pore through stacks of obscure titles of poorly regarded films (known as "schlock"), looking for the rare bargain that could then be resold in a retail store or through a catalog. Movie memorabilia conventions were mixed wholesale-retail markets, although tending to be more wholesale than retail. Some categories of movie memorabilia, such as twenty-four-sheets, six-sheets, and foreign posters were rarely sold at conventions in the mid-1980's. Three-sheets were sold only in small quantities at conventions in 1985 and generally commanded relatively low prices--$1 or $2 per item.

e.  The Collection

The collection donated to AMMI in December 1985 consisted of 7,378 items, including 546 duplicates, of movie memorabilia from 659 different films. The 546 duplicate items (nonaccessioned inventory) were not assigned accession numbers by the museum. The exact number of items in each category is shown in Table 1 in the appendix, based upon an inventory conducted by AMMI in December 1994. Most of the titles in the collection were of

films from the 1950's through the 1970's.  The overall physical
condition of the collection was mint, with many items having
never been handled.

The collection does not include any highly sought-after
items like one-sheets, half-sheets, or title cards for classic
collectible titles such as "Casablanca" or "Frankenstein".  The
well-known film titles in the collection are often represented by
somewhat less desirable types of memorabilia.  For example, the
collection contains a twenty-four-sheet and a pressbook for
"Goldfinger", the most highly regarded James Bond film.  The only
item in the collection from "The Misfits", with Marilyn Monroe
and Clark Gable, is a twenty-four-sheet.  "Exodus" is represented
in the collection by a 10-card lobby card set, a twenty-four-
sheet, a six-sheet, a three-sheet, and a pressbook.  The
collection also includes a six-sheet, a three-sheet, and a
pressbook for John Ford's "The Horse Soldiers", starring John
Wayne, and a twenty-four-sheet, a six-sheet, and two foreign
posters from "Vera Cruz", which starred Burt Lancaster and Gary
Cooper, a three-sheet and a pressbook from "Run Silent, Run
Deep", starring Clark Gable and Burt Lancaster, a pressbook from
Howard Hawks' "Red River", starring John Wayne, 16 black and
white stills, a three-sheet and a six-sheet of "Baby Face
Nelson", a six-sheet and a three-sheet from "Midnight Cowboy",
starring Jon Voight and Dustin Hoffman, and a six-sheet, four

foreign posters, and a lobby card set from "The Battle of Britain".

The collection includes one-sheets, half-sheets, and lobby cards of other better known films, including two one-sheets and a set of lobby cards of Fellini's "Satyricon", three one-sheets, a three-sheet, a lobby card set, and a pressbook from "The Big Country", a 1950's western starring Gregory Peck, Jean Simmons, and Burl Ives, as well as one-sheets of "A Streetcar Named Desire" starring Vivian Leigh and Marlon Brando, of "The Barefoot Contessa", starring Humphrey Bogart and Ava Gardner, and of "On Her Majesty's Secret Service", "Moulin Rouge", "Never on Sunday", and "Woman of Straw", the last a relatively obscure title with the well-known stars Gina Lollobrigida and Sean Connery.  The collection also includes one-sheets of "The Defiant Ones" with Sidney Poitier and Tony Curtis, and of "The Manchurian Candidate", with a cast that included Frank Sinatra, Janet Leigh, and Laurence Harvey.

The collection also contained memorabilia from a number of films that have achieved cult status over the years.  There is a one-sheet and a twenty-four-sheet from "Bwana Devil", one of the first 3D films, a one-sheet from "The Monster that Challenged the World", a one-sheet, a lobby card set, and a pressbook from "It! The Terror from Beyond Space", and a one-sheet of "Curse of the Faceless Man".

One-sheets of somewhat less famous and more recent films from the 1970's are also in the collection, including "Chato's Land", starring Charles Bronson, and "Comes a Horseman", which starred James Caan and Jane Fonda.  Many of the other one-sheets and other items in the collection are from relatively unknown films, such as "Macumba Love", that did not have any particularly outstanding attributes such as famous stars, superb artwork, or a cult following.  Most of these films were not listed in the price guides available in 1985, although many of them have subsequently appeared in price guides published in the 1990's.

The foreign posters in the collection included a number of famous titles.  There are three large foreign posters and two medium foreign posters each from French releases of the Clint Eastwood "spaghetti" westerns "For a Few Dollars More (Et Pour Quelques Dollars de Plus)" and "The Good, The Bad, and The Ugly (Le Bon, la Brute, le Truand)".  The collection also has three large and two small foreign posters of "La Cage aux Folles". Other foreign posters of American films in the collection include two large posters and one small poster of "The Curse of the Pink Panther", two medium posters of "Diamonds are Forever", one medium foreign poster from "The Magnificent Seven", and two medium posters of Woody Allen's "Sleeper (Woody et les Robots)".

A few items in the more popular categories of memorabilia in the collection are "schlock".  Some examples of one-sheet titles in this category include "Latigo", a 1971 release, "The

Degenerates", a 1972 release, "Drum", a 1976 release, and "The Man Who Loved Love", a 1977 release.  None of these films are listed in two of the major price guides from 1994.

The collection also contains 1,727 8- by 10-inch black and white and color still photographs.  The record does not reveal whether any of those stills had any particular merit or were of sought-after titles or film stars.  There were no duplicate stills listed in the AMMI inventory.

The 2,858 lobby cards constituted 39 percent of the items in the collection.  With very few exceptions, these were complete sets.  The inventory listed the cards in quantities of 4, 8, and 10, which were the numbers of cards commonly contained in sets of lobby cards issued by the studios.  Only 96 cards, or 12 sets of lobby cards, were listed as duplicates in the AMMI inventory.

The 836 foreign posters made up 11 percent of the items in the collection.  The foreign posters also include 310 of the 546 duplicates in the collection.  Only 1,043 larger items issued by American studios, such as one-sheets, three-sheets, six-sheets, and twenty-four-sheets, about 14 percent of the total, are included in the collection.  There are also relatively few half-sheets (114), window cards (39), and inserts (134) in the collection.  There are 331 pressbooks in the collection, of which 27 are duplicates.

## 2. The Donation of the Collection

By 1985, petitioner was running out of room to store the collection, and he had begun to consider selling it. He read an article about a new museum, AMMI, that would be opening its doors to the public in Astoria, New York, in the then-near future. He telephoned Eleanor Mish, the Registrar of AMMI, to inquire whether the museum would be interested in receiving the collection as a gift. Ms. Mish told petitioner that AMMI was interested in receiving such a gift. On September 24, petitioner wrote to Ms. Mish confirming his offer to donate the collection to the museum. At some time prior to December 31, 1985, petitioner donated the collection, consisting of 7,378 pieces, to AMMI. The December 31, 1985, deed of gift, for which petitioner supplied an initial inventory, misstates that inventory as 4,347 items. After making the donation, petitioner retained his print block collection and a large number of stills.

AMMI performed subsequent inventories of the collection and assigned accession numbers to all items except duplicates. The duplicate items were physically separated from the rest of the collection and held for subsequent sale or trade. None of the duplicates had been disposed of at the time of trial, in part because of the pendency of this proceeding.

In 1985, AMMI was in the process of preparing a venue in which to publicly display the collection it was then developing. The museum did not open its doors to the general public until

1988.  Because of space constraints, AMMI did not put any part of the collection on public exhibit until 1990, when the one-sheet of "Bwana Devil" was displayed.  AMMI also used some slides of items in the collection for promotional advertising and listed several of the posters in publicity photographs taken for the 1988 opening.

A number of items were exhibited at museums other than AMMI during the early 1990's.  Five lobby cards and a pressbook for "Exodus" were exhibited at The Museums at Stony Brook, Stony Brook, New York, from December 1990 to March 1991 as part of an exhibition called "Jews in American Cinema".  Three lobby cards from "The Joe Louis Story" were part of an exhibition entitled "From Harlem to Hollywood: American Race Movies 1912-1948", which was shown at AMMI on two occasions in 1990-91 and 1992-93.  That exhibition was also shown at the Museum of Fine Arts, Houston, Texas, from March to July 1991.

A number of items were also shown at AMMI from May to September 1994 in an exhibition called "Muky's New York: Photographer to the Postwar Film Renaissance".  At the time of trial, AMMI had scheduled an exhibit of the twenty-four-sheet from "Bwana Devil" after spending approximately $1,000 to restore and preserve it for exhibition.  The twenty-four-sheet from "Exodus" was also scheduled for display at the same time as part of the same exhibition.

## 3.  Petitioners' Valuation and Charitable Contribution Deductions

Petitioners used the services of an income tax return preparer to prepare their 1985 income tax return.  Petitioners requested and obtained extensions to file until October 15, 1986. The return was filed on October 13, 1986.  At the behest of their income tax return preparer, petitioners obtained two appraisals of the collection, one from Sigmund Rothschild and another from F. Peter Rose.  The latter appraisal, for $188,085, was used as the basis for a charitable contribution reported in petitioners' 1985 joint tax return.  A copy of the report of that appraisal was attached to the return.  The amount of the charitable contribution shown on the 1985 return was large enough to create a claimed carryover into succeeding tax years through 1990.

Petitioners claimed that carryover in their 1986 through 1988 joint income tax returns.[4]  The parties executed a series of

---

[4] Petitioners' charitable contribution deductions shown on their returns for the years at issue were as follows:

| Taxable Year | Beginning Balance | Charitable Deduction Claimed | Amount of Carryover |
|---|---|---|---|
| 1985 | $188,085 | $20,885 | $167,200 |
| 1986 | 167,200 | 20,808 | 146,392 |
| 1987 | 146,392 | 21,763 | 124,629 |
| 1988 | 124,629 | 21,859 | 102,770 |

Except for an additional $162 not at issue, the charitable contribution deduction claimed for each year in issue is also the adjustment to income that formed the basis for the underpayment determined by respondent in the statutory notice of deficiency

(continued...)

valid consents to extend the period of limitations until December 31, 1993, for tax years 1985 through 1988. On December 17, 1993, respondent mailed a statutory notice of deficiency to petitioners for the tax years in question based upon a determination that the fair market value of the collection was $1,956 in December 1985. Petitioners filed a timely petition with the Tax Court.

## ULTIMATE FINDINGS OF FACT

1. In December 1985, the relevant market for the sale of movie memorabilia was the retail store.

2. In 1985, the fair market value of the entire collection was $50,412. The fair market value of the collection and of each category of memorabilia in the collection is:[5]

---

[4](...continued)
for that year.

Petitioners claimed an additional $60,000 to $65,000 in deductions attributable to the carryover in tax years 1989 and 1990. Those years were barred from assessment by expiration of the period of limitations.

[5] These values are drawn from Tables 1 and 2 in the appendix. Table 1 summarizes the values for each category of movie memorabilia in the collection from the parties' experts and the Court's independent valuation. Table 2 contains comparative values drawn from the parties' experts and the Court's valuation of 106 one-sheets for which the record contained retail sales prices independent of either party's expert's valuation. This reference sample formed the basis for the Court's valuation. See infra note 8 and notes 15-17 and accompanying text for further explanation of the Court's methodology.

| Category | Dimensions (inches) | Quantity | Category Total |
|----------|---------------------|----------|----------------|
| 1-sheet | 27 x 41 | 513 | $9,746 |
| 3-sheet | 41 x 81 | 306 | 9,128 |
| 6-sheet | 81 x 81 | 176 | 6,019 |
| 24-sheet | billboard | 48 | 83 |
| Half-sheet | 22 x 28 | 114 | 1,733 |
| Insert | 14 x 36 | 134 | 2,037 |
| Lobby card | 11 x 14 | 2,858 | 6,788 |
| Lobby card | 8 x 10 | 296 | 703 |
| B & W still | 8 x 10 | 1,709 | 189 |
| Color still | 8 x 10 | 18 | 5 |
| Lg. foreign | 47 x 62 | 449 | 6,398 |
| Med. foreign | 23 x 31 | 267 | 3,805 |
| Sm. foreign | 16 x 21 | 120 | 1,710 |
| Pressbook | various | 331 | 1,572 |
| Window card | 14 x 22 | 39 | 496 |
| Total | | 7,378 | 50,412 |

OPINION

1.  Introduction

The primary issue for decision is the 1985 fair market value of the collection of movie memorabilia that petitioner donated to AMMI.  Because we find that petitioners' valuation of their 1985 charitable donation to AMMI is more than 150 percent of the Court's valuation, we must also decide whether petitioners are liable for an addition to tax under section 6659 for any year at issue in which they claimed a charitable contribution deduction

based on the carryover they claimed from 1985 under section 170(d)(1)(A).

This is another case in which this Court has been called upon to value transferred property on the basis of appraisals by well-qualified experts who arrive at fundamentally incompatible valuations. The valuations offered by the parties' experts at trial vary by a factor of 26 ($149,451 for petitioners versus $5,733.49 for respondent).[6] The experts' appraisals hardly narrowed the gap between petitioner's initial valuation of the donation and respondent's initial determination of the value in the notice of deficiency: the former was 90 times larger than the latter. The parties have failed to settle this matter through negotiation, thus calling upon the Court to use its judgment in an area in which it has no preexisting expertise, with opposing experts' valuations that provide little more than remote reference points as guidance.

Section 170(a) provides a deduction for any charitable contribution made within the taxable year. Section 1.170A-1(c)(1), Income Tax Regs., provides that if "a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution". Fair market value is the price at

---

[6] Examples of the extreme differences between the experts' valuations of individual items in the collection abound. See Table 2.

which the property would change hands between a willing seller and a willing buyer who both have a reasonable knowledge of the facts and are not under any compulsion to sell or buy. United States v. Cartwright, 411 U.S. 546, 550-551 (1973); sec. 1.170A-1(c)(2), Income Tax Regs. Respondent's determination of the fair market value is presumed to be correct, and petitioners have the burden of proving otherwise. Rule 142(a). However, fair market value is a question of fact, Lio v. Commissioner, 85 T.C. 56, 66, 68 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987), that this Court must answer as a matter of judgment, Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347, on the basis of all the evidence in the record, Helvering v. Safe Deposit & Trust Co., 316 U.S. 56, 66-67 (1942); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

Although the regulations under section 170 provide no guidance on whether to value property in bulk or on an individual basis, or on the market to be used to value property and how to select that market, the guidance found in the Estate Tax Regulations is applicable to charitable contributions for income tax purposes. Champion v. Commissioner, 303 F.2d 887, 892-893 (5th Cir. 1962) ("There is no distinction, for most purposes * * * in the meaning of fair market value as used in an estate tax case and one involving income tax."), revg. and remanding on other grounds T.C. Memo. 1960-51; Anselmo v. Commissioner, 80

T.C. 872, 881 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). The

fair market value of an item of property shall not

> be determined by the sale price of the item in a market
> other than that in which such item is most commonly
> sold to the public, taking into account the location of
> the item wherever appropriate. Thus, in the case of an
> item of property * * * which is generally obtained by
> the public in the retail market, the fair market value
> of such an item of property is the price at which the
> item or a comparable item would be sold at retail.
> * * * The value is generally to be determined by
> ascertaining as a basis the fair market value as of the
> applicable valuation date of each unit of property.
> * * * [Sec. 20.2031-1(b), Estate Tax Regs.]

## 2. The Experts

Each party submitted an expert report, supported by

extensive testimony, that selected a different market in which to

value the collection. The experts' contradictory assumptions and

their differing conclusions about which market is relevant and

the state of those different markets in 1985 partly explain the

extent of their disagreement.

Expert opinions can aid the Court in understanding an area

of specialized training, knowledge, or judgment, Perdue v.

Commissioner, T.C. Memo. 1991-478, even when the opinions are

poles apart as they are in this case. While we may accept the

opinion of an expert in its entirety, Buffalo Tool & Die

Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we

are not bound by the expert opinions proffered on behalf of

either party, Silverman v. Commissioner, 538 F.2d at 933, and may

selectively use any portion of such reports and testimony, IT&S

of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 562 (1986).  Consequently, we will consider the opinions of the two experts in their written reports and testimony insofar as they help us determine the relevant market and the appropriate methodology to be used in answering ultimate question, the the fair market value of the collection. IT&S of Iowa, Inc. v. Commissioner, supra; Chiu v. Commissioner, 84 T.C. 722, 734-735 (1985); see also Estate of Gray v. Commissioner, T.C. Memo. 1993-334.

### a.  Petitioner's Experts

Petitioner initially obtained two appraisals of the collection in order to ascertain the amount of their charitable deduction.  F. Peter Rose performed the appraisal of the collection, which he valued at $188,085, that petitioners ultimately used in preparing their 1985 income tax return. Another appraisal was performed by Sigmund Rothschild, who valued the collection at $186,575.  Messrs. Rose and Rothschild performed approximately 1,500 appraisals of "reproduction masters" of works of art in connection with tax shelters marketed by Jackie Fine Arts.  Rose v. Commissioner, 88 T.C. 386, 398-399 (1987), affd. 868 F.2d 851 (6th Cir. 1989).  Both Rose and Rothschild, by reason of the inflated values in those appraisals,

were also named as defendants in numerous lawsuits by investors in Jackie Fine Arts tax shelters.[7]

We reject both the Rose and the Rothschild appraisals, which exceed by more than 20 percent the values asserted by petitioner's expert at trial. The record fails to support either of these appraisals.

Nothing in the record supports an inference that, at the time petitioner engaged the two appraisers, he could have reasonably known of their role in marketing the Jackie Fine Arts tax shelter. Petitioner did not obtain the appraisals from Messrs. Rose and Rothschild with intent to inflate the value of his charitable contribution for the gift of the collection to AMMI.

Petitioner retained Morris Everett (Everett) to appraise the collection and to prepare an expert report for trial. At the time of trial, Everett had been a collector of movie memorabilia for over 30 years and a dealer since 1984. He opened his first retail store in Cleveland, Ohio, in 1987, and later opened other stores in Hollywood and New York City.

Everett based his valuation of the collection on the prevailing 1985 prices in the retail store and catalog sales

---

[7] See, e.g., Faircloth v. Finesod, 938 F.2d 513 (4th Cir. 1991); Mechigian v. Art Capital Corp., 612 F. Supp. 1421 (S.D.N.Y. 1985); Ross v. Jackie Fine Arts, Inc., No. C/A 2:85-2425-1 (D.S.C. 1991); Daggett v. Jackie Fine Arts, Inc., 733 P.2d 1142 (Ariz. Ct. App. 1986).

market.  In preparation for assigning values to the collection, Everett consulted dealers whom he knew or had dealings with who had owned or operated retail stores in 1985.  He also consulted various trade publications.

Everett included all 7,378 items in the inventory in his valuation, including the 546 duplicates.  To value each item within the 15 categories of movie memorabilia in the collection, Everett assigned an "average value" to the items in each category.  He assigned one or more premium units to more desirable titles, valued as a multiple of the "average value" assigned to items in that category.  Thus, each three-sheet was assigned an "average value" of $30.  If Everett assigned three premium units to a title, the three-sheet would be valued at $90, or three times the "average value".[8]

---

[8] Table 1 contains a summary of the values assigned to each category of memorabilia by Everett.

Table 2 contains the reference sample, which compares values obtained from price guides entered in the record as joint exhibits with the corresponding values assigned by Everett and Warren for 106 one-sheets in the collection.  See infra notes 15-17 and accompanying text.  The Court used price guides and catalogs from 1985 that had been received into evidence.  The record shows that retail store, mail order catalog, and price guide prices were roughly equivalent.

The price guides and catalogs used were Luton's Original Theater Posters No. 6 (1985); Luton's Original Theater Posters No. 8 (1986) (price scale prices of common items identical to 1985 edition) (hereinafter collectively Luton's); Cinemonde Thriller 1985; Cinemonde Action 1985; Poster City Catalog Three, December 1984 (hereinafter Poster City); Dietz, Price Guide and Introduction to Movie Posters and Movie Memorabilia (2d ed. 1985)

(continued...)

As an example, Everett did not assign any premium units to items in the collection from "Annie Hall", a Woody Allen film released in 1977.  Everett valued the one-sheet at $20, the "average value" for all one-sheets, and the insert at $15, the "average value" for that category.  Everett valued the lobby cards at $5 each, the "average value" for all 11- by 14-inch lobby cards, regardless of whether they contained "live" or "dead" scenes.  He assigned five premium units to Fellini's "Satyricon", resulting in values for the two one-sheets in the inventory of $100 each, $40 apiece for the lobby cards, and $75 for the insert.

Everett's "average values" were considerably higher than the minimum prices charged for those categories of items in retail stores.  For instance, Everett considered $15 to have been the minimum price charged in 1985 for any one-sheet at a retail store in New York.  Other sources put the minimum price between $5 and $10.  The "average value" Everett assigned to one-sheets was $20. He based his relatively high "average values" on the desirability of the collection as a whole, especially its uniformly mint condition.[9]

---

[8](...continued)
(hereinafter Dietz).  Warren's Movie Poster Guide (1986) was not used because it was already reflected in the prices he had assigned to some of the items.

[9] On cross-examination, Everett could not give a technical answer to the meaning of the term "average".  Everett may have

(continued...)

Everett also considered the desirability of the 659 titles in the collection, which he characterized as "middle of the road" rather than "high end". He reported that prices for titles such as those in the collection appreciated rapidly during the 1970's and early 1980's and, in most cases, have not appreciated greatly since then.[10] In making his valuation, Everett also took into account the overall mint condition of the United Artists movie memorabilia in the collection. Everett took into account the development of the market throughout the mid-1980's up through 1987 because he believed that it was developing slowly throughout that period. He took into account in his report events that occurred both prior to and shortly after the donation when he valued the collection.[11]

---

[9](...continued) meant to characterize the "average value" as a base price for items in the collection in a particular category.

[10] Warren, respondent's expert, asserted that prices for movie memorabilia rapidly went up in all categories during the period 1986 to 1995, sometimes as much as 50 times or more. A comparison of prices in the 1985 price guides, see supra note 8, to the prices listed in the 1994 price guides that were also in evidence shows that the 106 items in the reference sample appreciated somewhere between 0 and 100 percent between 1985 and 1994.

[11] Normally, post-donation market events that are not foreseeable must be disregarded. However, prospective events may be referenced for the limited purpose of establishing what the willing buyer's and seller's expectations were on the valuation date and whether those expectations were "reasonable and intelligent". Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987); Estate of Jephson v. Commissioner, 81 T.C. 999 (1983).

(continued...)

b. Respondent's Experts

Respondent determined in the notice of deficiency that the value of the collection at the time of the gift to AMMI was $1,956. The report upon which that determination of value was based was not made part of the record, and the record contains no allocation of that amount among the various categories of movie memorabilia in the collection. Respondent retained Jon R. Warren (Warren) to determine the December 1985 fair market value of the collection and prepare an expert report for trial. Warren also testified at trial as respondent's expert. He is the author of "Warren's Movie Poster Price Guide", which was initially published in 1986. Subsequent editions were published in 1993 and 1994. Warren also edits magazines devoted to movie memorabilia, is a member of the International Appraiser's Society, and is senior price editor for a major comic book pricing guide. Warren began collecting memorabilia in 1976 and began collecting movie memorabilia in 1980. During the mid-1980's, Warren's movie memorabilia expertise was concentrated in pre-1960 films. Warren became a dealer in movie memorabilia after 1985. With subsequent editions of his book and other business dealings, Warren has become a major dealer in movie

---

[11](...continued)
We attach limited weight to post-1985 market events in this case because we find that the "reasonable and intelligent" expectations of a willing buyer and seller would be based primarily on market conditions existing in 1985 and the years prior thereto, and not on any prospective events.

memorabilia. At the time of trial, Warren maintained a database of prices of over 100,000 items of movie memorabilia.

Warren assumed that the relevant market was the movie memorabilia convention. He based his assumption on the buyer's being a knowledgeable collector who performed, or should have performed, an appropriate amount of research prior to entering the convention market, which is a mixed wholesale/retail market. Warren asserted that the single key element in pricing movie memorabilia is demand by collectors for a given title.

The interplay of these two assumptions was critical to how Warren priced several categories of memorabilia in the collection. He heavily discounted the value of foreign posters because he maintained that there was little or no demand for them in the mid-1980's. In Warren's view, collectors viewed foreign posters of American films as inauthentic novelties, and that only when domestic posters, especially one-sheets, began to rise dramatically in price after 1985 did collectors begin to show interest in foreign posters of American films. According to Warren, twenty-four-sheets were considered virtually worthless in the 1985 movie memorabilia markets because of their size. The only twenty-four-sheets then in demand were classic titles such as "Gone With the Wind". Warren contends that three-sheets and six-sheets were likewise virtually worthless in 1985, although they subsequently came to be worth as much as one-sheets, if not more.

Warren considered the collection as a whole to have little intrinsic value because it consisted of "minor or unknown films released by United Artists". He evaluated the collection as little more than a hoard, virtually unsalable within a short period of time, even at distress sale prices in the convention market. Warren also discounted the overall value of the collection because it consisted mostly of stills, pressbooks, and lobby cards, which he considered to be of the lowest value to a collector. Based upon these foregoing considerations, Warren assigned values as low as 25 cents to individual items. Warren's base value for a one-sheet was $1. His highest single assigned value for a one-sheet was $75 for "Thunder Road". Warren appraised the collection at the time of its donation to AMMI in 1985 at $5,733.49.

## 3. The Relevant Market

Selection of the proper market for valuation purposes is a question of fact. Anselmo v. Commissioner, 757 F.2d at 1213. In determining the appropriate market to use in valuing most types of property, a sale "to the public" normally refers to a sale to the retail customer who is the ultimate consumer. Lio v. Commissioner, 85 T.C. at 70; Anselmo v. Commissioner, 80 T.C. at 882. A sale to an ultimate consumer is any sale to those persons who do not hold the item for subsequent resale. Goldman v. Commissioner, 388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966). However, when used in this context, the term

"retail" does not mean that the most expensive source is the only source for determining fair market value. Fair market value is determined in the market most commonly used by the ultimate consumer, which may or may not be the most expensive, since ultimate consumers may simultaneously participate in multiple markets with different price structures. Lio v. Commissioner, supra at 70.

There are several factors to consider in choosing the relevant market. First is the identity of the buyers and sellers. They must be purely hypothetical, Estate of Andrews v. Commissioner, 79 T.C. 938, 954 (1982), reasonably knowledgeable, and not under any compulsion to buy or sell, sec. 20.2031-1(b), Estate Tax Regs. Warren assumed that conventions were the appropriate market partly because a discriminating collector would not necessarily pay the higher prices charged by retail stores. See, e.g., Chou v. Commissioner, T.C. Memo. 1990-90, affd. without published opinion 937 F.2d 611 (9th Cir. 1991).

We disagree with Warren's assumption on this issue. The regulations and case law require only that the hypothetical willing buyer and seller have "reasonable" knowledge. Sec. 20.2031-1(b), Estate Tax Regs. That requirement may be satisfied by an organized market because it has assimilated the available information to arrive at a market price. Estate of Gilford v. Commissioner, 88 T.C. 38, 55 (1987) (referring to organized, public markets for stock). The record shows that both the retail

store and convention markets were organized public markets in 1985.

Dealers and collectors who bought and sold at movie memorabilia conventions were also not necessarily ultimate consumers. Lio v. Commissioner, 85 T.C. at 70; Anselmo v. Commissioner, supra at 882. Many collectors, who bought and sold as ultimate consumers on their own account, were also dealers who bought and sold inventory for their businesses on the wholesale level. It is unclear from the record how many buyers at conventions were "ultimate consumers" and how many were dealers.

The items to be valued must also be available for sale in the relevant market. The record shows that only a limited number of types of movie memorabilia were sold in conventions, making that market comparatively unsuitable for selling much of the collection in this case. Warren testified that size prevented the two physically largest categories of movie memorabilia at issue in this case, six-sheets and twenty-four-sheets, from being sold at conventions in 1985. Three-sheets were sold only on a very limited basis. Foreign posters, a major part of the collection, were also rarely sold at conventions. Memorabilia sold at conventions also tended to be "picked over" and usually were not in mint condition. One of the most noteworthy attributes of the collection was the completely unused, mint condition of most of the items.

Sellers who sold large quantities in bulk at conventions also tended to be selling at distress prices, even below the values in Warren's report. A sale at distress prices indicates a seller under compulsion or a bulk sale. The regulation does not permit either circumstance to dictate valuation. Sec. 20.2031-1(b), Estate Tax Regs.

In 1985, stores specializing in movie memorabilia were located in such major metropolitan areas as New York, Los Angeles, and San Francisco. These stores also competed in nationwide markets through catalog sales along with dealers who specialized in catalog sales. Despite the lack of specific comparative sales data in the record concerning the different markets, we conclude that it is more likely than not, based upon the testimony of both experts, that retail stores were the most common form of sale to "ultimate consumers" of movie memorabilia in 1985.

The mint condition of the collection particularly suited it to sale on consignment in the retail store setting or in the catalog sales market. The absence of "high end" titles would have precluded sale of most of the collection on an item-by-item basis in the auction market. These factors support our ultimate finding that, in December 1985, retail stores were the relevant market for the Leibowitz collection. We therefore reject Warren's overall valuation of the collection.

Everett chose the correct market in which to value the collection. However, for other reasons discussed below, we also reject his valuation. Warren conceded in testimony that Everett's valuation was accurate for the New York retail store market in 1985 because retail store prices were markedly higher than those found at conventions. However, our analysis of the record indicates that Everett's valuation is too high.

There are two major problems with Everett's valuation. First, Everett's use of flawed methodology in determining base prices inflated the entire valuation. In determining a base price for each category of item, Everett used an "average price" for that category. As respondent correctly points out on brief, this meant that Everett assumed that each item in the collection was worth at least the average value in the marketplace of all such items for sale. Even when taking into account the mint condition of the collection, this approach improperly inflates the valuation. As our analysis infra shows, Everett's assigned values for 106 one-sheet posters were 1.76 times greater than prices shown in catalogs and price guides in evidence for those same items.[12] Everett should have used a base price for items in

---

[12] See also Table 2, which is a comparison of Everett's and Warren's valuations of 106 one-sheets for which the record also contained prices from independent pricing guides, and supra note 8, and infra notes 15-17 and accompanying text, which explain the methodology used in Table 2. Everett's valuation was $4,760, 1.76 times greater than the total prices of $2,697 for the same one-sheets found in other pricing guides.

each category equal to the nominal prices charged in the relevant market in 1985 and then applied premium units to individual items based upon condition as well as desirability of the title.

Second, Everett failed to take into account the presence of dead scene cards in the lobby card sets. "Live cards" were worth considerably more than "dead cards", even when included in complete sets of lobby cards. Even though Everett adverted in his testimony to the distinction between live and dead cards, he did not systematically account for it in his valuation. There is also nothing in the record to support Everett's assertions of value in two other categories, twenty-four-sheets and 8- by 10-inch stills.[13]

For these reasons, we reject Everett's valuation, even though he chose the correct market and his overall methodology of assigning premium values to more desirable titles relative to all the items in a category would have been a reasonable approach if he had used a valid base price.

3.  Court's Valuation of the Collection

In Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. at 452, we observed that

> each of the parties should keep in mind that, in the
> final analysis, the Court may find the evidence of
> valuation by one of the parties sufficiently more
> convincing than that of the other party, so that the
> final result will produce a significant financial

---

[13] As discussed infra note 20, the twenty-four-sheets may well have had some value in 1985.

defeat for one or the other, rather than a middle-of-
the-road compromise which we suspect each of the
parties expects the Court to reach. * * *

The record in this case would not allow the Court to accept one or the other of the parties' valuations outright because each was so grossly contrary to the evidence. Buffalo Tool & Die Manufacturing Co. v. Commissioner, supra; see also Estate of Halas v. Commissioner, 94 T.C. 570, 577-578 (1990).

We note that if petitioners had not met the burden of producing sufficient evidence to support an independent valuation over respondent's valuation, we would have had to hold for respondent even if we had rejected the valuation of respondent's expert. In Anselmo v. Commissioner, 80 T.C. at 884-885, we rejected the valuations of both parties' experts, but upheld the Commissioner's determination of value used in the notice of deficiency. In Anselmo, the testimony of the taxpayer's experts showed there was no reliable way of working back from the figures they computed because they had relied upon the retail store market and not the wholesale market. In that case, we held that the wholesale market was the relevant market for low-quality, unset gemstones. The ultimate consumers of those unset gemstones were jewelers who would in turn mount them into settings to sell to retail customers, who were the ultimate consumers of low-quality, set gemstones. Id.

We need not rely upon the burden of proof to value most of petitioner's collection. Everett, petitioners' expert, used the

proper market, retail stores, to value the collection. The record also contains sufficient evidence to enable us to work back from Everett's figures to arrive at a reliable independent valuation for all but three categories of memorabilia in the collection.

### a. Blockage Discount

Once a proper market is selected, individual items in a charitable contribution are to be valued individually, and not in bulk. Sec. 20.2031-1(b), Estate Tax Regs. However, where a block of property could not be sold on the valuation date or within a reasonable period thereafter without affecting market price, the Court must apply a "blockage" discount. Richardson v. Commissioner, 151 F.2d 102, 103 (2d Cir. 1945), affg. a Memorandum Opinion of this Court dated November 30, 1943. This Court has applied blockage discounts to estates of artists that contain large numbers of the artist's own works for which there is only a limited market because of the nature of the art. Calder v. Commissioner, 85 T.C. 713, 722-723 (1985) (blockage discount applied to six simultaneous gifts of large number of works by one artist); Estate of Smith v. Commissioner, 57 T.C. 650, 658 (1972), affd. 510 F.2d 479 (2d Cir. 1975) (blockage discount applied where estate contained 425 pieces and record showed that artist's works appealed to relatively small group of willing buyers); see also Estate of O'Keeffe v. Commissioner, T.C. Memo. 1992-210. The Court has also applied a blockage

discount to a charitable donation of a collection of Yiddish sheet music, obtained in a single bulk purchase, containing hundreds of identical copies that would have depressed prices if they had been sold. See Rimmer v. Commissioner, T.C. Memo. 1995-215 (85,000 pieces of 650 separate titles in a declining market). Blockage discounts--if appropriate to the particular facts in the case--apply to donations to museums. Estate of O'Keeffe v. Commissioner, supra. Determination of a reasonable period of time "depends on all the facts and circumstances". Estate of Sawade v. Commissioner, T.C. Memo. 1984-626, affd. 795 F.2d 45 (8th Cir. 1986). Periods of up to a year have been found to be reasonable, id., although such periods may be much shorter if factors such as market volatility and time limitations so dictate.

The parties' experts differed on the amount of time that it would take to sell the collection. Warren postulated a period of no less than 1 to 2 years because of the difficulties attendant in gaining access to the market. However, Warren did not consider how long it would take a skilled dealer in movie memorabilia already present in the retail store market to sell the collection. Bull v. Smith, 119 F.2d 490, 492 (2d Cir. 1941). Everett estimated that the collection could be sold on consignment in a retail store within a year without affecting the prices obtained for each individual item. The collection was

relatively small in relation to the inventory carried by a movie memorabilia store or chain of stores.[14]

A year to liquidate the collection at full retail store prices would not be unreasonable under the circumstances. The minimal physical storage requirements and comparatively stable prices in the movie memorabilia market over the course of a year support such a finding. Sec. 20.2031-2(e), Estate Tax Regs.

These same characteristics would also tend to minimize carrying costs. There would be no additional marketing expenses since such a store would already be in existence and the collection would merely be an addition to existing inventory, utilizing existing marketing techniques. Everett's estimate of a year is also quite short in comparison to the periods of time far exceeding a year that would be required to liquidate the estate of an artist with a large body of work. See, e.g., Calder v. Commissioner, supra at 725-726 (period of up to 22 years to liquidate collection); Estate of O'Keeffe v. Commissioner, supra (more than 10 years to sell entire collection).

It would also be inappropriate to discount the collection as we did the donation of thousands of duplicate copies of Yiddish sheet music in Rimmer v. Commissioner, supra, or the large number of donated books in Skripak v. Commissioner, 84 T.C. 285, 324

---

[14] There are 7,378 items in the collection. Everett testified that his three stores carry in excess of 3 million items in inventory. His personal collection was even larger than that.

(1985) (500,000 reprints of scholarly books donated in large, coordinated program were worth only 20 percent of retail list price). Only 546 of the 7,378 items in petitioner's collection were duplicates, and generally there were no more than two to three copies of any particular item. Furthermore, these items had value in the marketplace because of the existence of an active barter market where dealers, collectors, and museums could trade. Contrary to respondent's contention, the fact that AMMI had not yet participated in that market at the time of trial, albeit in part because of the pendency of this proceeding, is of no moment in determining whether to value the duplicates at full fair market value.

Based upon the foregoing considerations, we do not apply a blockage discount to the fair market value of petitioner's collection.

### b.  Fair Market Value of the Collection

We recognize that valuation of property is an inexact science. If the parties do not settle on a value, and neither party's appraisal can be accepted, the Court can resolve it only through "Solomon-like" pronouncements, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. at 452, based upon evidence in the record.

We considered a number of factors in arriving at a fair market value of the collection. The agreed mint condition of the collection played a major role, both in determining the relevant

market, as discussed supra, and in valuing each item for sale on an individual basis.  Everett's testimony that the collection's mint condition would tend to increase the prices commanded in a retail store was strongly supported by commentary in all of the movie memorabilia pricing guides in evidence.

The level of collector demand for the titles in the collection was also very important.  Everett characterized the collection as "middle of the road".  The pricing guides, Warren's concession that at least some of the titles were marketable, and the evidence in the record that the collection as a whole could be sold in the New York retail market all support Everett's characterization.  The collection contained some quite desirable titles, some titles for which there was an identifiable level of demand, and still others for which ascertaining any level of demand from the record was difficult.

The record indicates that the base price of one-sheets, the most commonly sold category of movie memorabilia, was somewhere between $5 and $15 in December 1985.  In no case did any 1985 pricing guide in the record, other than Warren's, indicate a value of less than $10 for any one-sheet.  But Warren's 1985 prices were intentionally low--as Warren himself revealed in later editions of his price guide.  The 1985 price guides in the record, other than Warren's, list prices for 106 one-sheets in

the collection (hereinafter reference sample).[15]  The sample uses the lowest price found, independent of either of the experts, for each of the 106 matched items.[16]  The total for the 106 one-sheets was $2,697, for an average value of $25.44.  The lowest value was $10, and the highest found was $137.50.  We compared the reference sample of independent prices with Warren's and Everett's valuations.[17]

Everett's valuation of the same 106 one-sheets was $4,760, or $44.91 per item.  The lowest value assigned by Everett was $20 and the highest was $200.  The ratio of the values in the reference sample to Everett's valuation was 0.57.  Warren valued the same sample at $782, or $7.38 per item.  The overall value of the reference sample was 3.45 times greater than Warren's valuation.  The lowest value assigned by Warren was $1 and the highest was $75.

For purposes of assigning a valuation to the rest of the 513 one-sheets, the ratio of the reference sample to Everett's valuation of the sample, 0.57, was used to adjust Everett's valuation of the whole.  Warren's valuation was disregarded because it used the wrong market and did not assign values to any

---

[15] See supra note 8 for price guides that listed prices for the 106 one-sheets in the reference sample.

[16] Where a poster was listed in more than one pricing guide, we took the lowest price.  If a pricing guide gave a range of prices for a poster, we used the midpoint of the range of values.

[17] See Table 2.

of the 546 duplicates in the collection.  As discussed supra, the duplicates have the same fair market value as the rest of the collection and should be included in the valuation.  When the ratio of 0.57 is applied to Everett's valuation of the 513 one-sheets, the one-sheet category is valued at $9,746, an average value of $19.

With the exception of lobby cards, too little information exists in the record to gather reliable independent prices for large enough samples in the other categories of movie memorabilia to similarly adjust Everett's valuations.  However, the pricing guides, such as Luton's, Dietz, and Warren, give ranges of values relative to one-sheets for several categories.  We adopt the midpoint of these values for each category in which they are available.[18]  In the 9- by 12-inch lobby card category, 46 titles were priced in Luton's, at an average price of $20.24 per set of eight cards, or $2.53 per card.  This price is similar to Dietz, which priced complete sets of lobby cards at the same price as a one-sheet for a given title, or about $19 per set for this collection.  In the absence of further available information, we adopt the lower of these two estimates, or $19 per set.[19]

---

[18] See Table 1 for a summary of the valuation of the collection by category of movie memorabilia.  The valuations of the parties' experts for each category are also listed.

[19] See Table 1.

For the remaining categories, twenty-four-sheets, color stills, and black and white stills, the record contained insufficient facts upon which to base a reliable value.[20]  We find that petitioners have failed to carry their burden of proof in establishing a fair market value in those categories.  Anselmo v. Commissioner, 80 T.C. at 884-886.  Therefore, respondent's valuation must be used for those three categories.  However, we also find that respondent, by virtue of having submitted an expert report that values the collection at $5,733.49, nearly three times greater than the $1,956 valuation underlying the determination in the notice of deficiency, has effectively conceded that $1,956 is too low to be the 1985 fair market value of the collection.  We therefore adopt the values in Warren's

---

[20] The only reference to a value for twenty-four-sheets was to "The Misfits", which was offered at a suggested price of $600 to $1,000 at the October 1985 Guernsey's auction, but was not sold.  Even with the drawbacks of being made in the auction market without identification of a willing buyer, the offer indicates that the twenty-four-sheets had some value in the auction market.  Also, the fact that AMMI had been organized by 1985 indicates that all movie memorabilia had some intrinsic value not necessarily quantifiable by reference to sales in an open market, much as the sculptures in Estate of Smith v. Commissioner, 57 T.C. 650, 658 (1972), affd. 510 F.2d 479 (2d Cir. 1975), were valuable even though the large size of many of them restricted their appeal to museums and other like buyers. AMMI's willingness to restore the twenty-four-sheet for "Bwana Devil" also indicates an intrinsic value, even if only for purposes of scholarly research and display.  However, these indications are too slender a collection of reeds to sustain a valuation of all 48 twenty-four-sheets in the collection.

The only reference to prices for stills was in Dietz, who refused to give a specific range of values because there were too many pricing variables.

report for those three categories of memorabilia only.  We find that the total fair market value of the collection in December 1985 was $50,412.

4.  Additions to Tax for Valuation Overstatement

Section 6659(a) imposes an addition to tax if there is an underpayment of tax of at least $1,000, sec. 6659(d), attributable to an overstatement of the value of charitable deduction property.  This addition to tax is applied to each year in issue, in this case all the years in which an underpayment results from a deduction claimed pursuant to a charitable contribution and its related carryover when such deductions are "attributable to a valuation overstatement".  Sec. 6659(a); Todd v. Commissioner, 862 F.2d 540, 542-543 (5th Cir. 1988), affg. on this issue 89 T.C. 912 (1987); see also Rogers v. Commissioner, T.C. Memo. 1990-619.  There is a valuation overstatement where the claimed value is 150 percent or more of the amount determined to be correct.  Sec. 6659(c).  Here, petitioners claimed a charitable donation of $185,085.  We have found the fair market value of the collection to be $50,412.  These figures place petitioners' overstatement well in excess of the section 6659(c) 150 percent threshold.

Petitioners seek relief under section 6659(e), which allows waiver of "all or any part of the addition to the tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation * * * and that such claim was

made in good faith." A taxpayer must satisfy two requirements to obtain relief. Sec. 6659(f)(2). Section 6659(f)(2)(A) requires that the taxpayer obtain a "qualified appraisal", sec. 6659(f)(3)(C), by a "qualified appraiser", sec. 6659(f)(3)(B). In addition to obtaining an appraisal, the taxpayer must make a good faith investigation into the value of the contributed property. Sec. 6659(f)(2)(B); see also McMurray v. Commissioner, 985 F.2d 36, 43 (1st Cir. 1993), affg. in part on this ground, revg. in part on other grounds, and remanding T.C. Memo. 1992-27.

Rose was a qualified appraiser within the meaning of section 1.170A-13(c)(5), Income Tax Regs.[21] His appraisal was a "qualified appraisal" that met the requirements of section 1.170A-13(c)(3), Income Tax Regs., and was relied on by petitioner in good faith. Nothing in the record indicates that, at the time of the appraisal, petitioner knew, or had any reason to know, of the participation of Messrs. Rose and Rothschild in the Jackie Fine Arts imbroglio, nor does the record indicate that

---

[21] To be a "qualified appraiser" within the meaning of sec. 1.170A-13(c)(5)(i), Income Tax Regs., an appraiser must have: (1) held himself or herself out as an appraiser or performed appraisals on a regular basis; (2) been qualified on the basis of background, experience, education, and membership, if any in a professional association; (3) not been an excluded person under sec. 1.170A-13(c)(5)(iv), Income Tax Regs.; and (4) understood the consequences of rendering an intentionally false appraisal.

Based upon Rose's testimonials, his membership in the American Society of Appraisers, and the lack of any contrary information reasonably available to petitioner, Rose met the requirements of sec. 1.170A-13(c)(5)(i), Income Tax Regs.

petitioner engaged the two appraisers with the intent to inflate artificially the amount of petitioners' charitable contribution deduction. See sec. 1.170A-13(c)(5)(ii), Income Tax Regs.

Section 6659(f)(2)(B) requires the taxpayer to have made a good faith investigation of the value of the contributed property in addition to the appraisal. At the advice of petitioners' accountant, petitioner obtained two appraisals. The first was performed by Rothschild and the second by Rose. Petitioner ultimately used Rose's appraisal to value the charitable contribution. Petitioner obtained Rothschild's name from the American Society of Appraisers first and then later obtained Rose's name either from Rothschild or from the Appraisers Association of America. In 1985, both Rose and Rothschild were seemingly well-respected appraisers. Several years earlier, Rothschild had been recommended to Everett by the IRS for an entirely different appraisal in the early 1980's of movie memorabilia unrelated to this case. When Everett inquired at that time about Rothschild at the American Film Institute, as a matter of due diligence, he received a favorable recommendation.

In 1985, Rose was a member of the board of the Appraisers Association of America and a senior member of the American Society of Appraisers. He also listed an impressive number of recent clients, including The Brooklyn Children's Museum, the American Museum of Natural History, and Chemical Bank. Rose's curriculum vitae and the recommendations that petitioner received

from Rothschild and the Appraisers Association of America gave petitioner no reason to doubt either the competence of Messrs. Rothschild and Rose or their independence from each other at the time of the appraisals. Additionally, petitioner availed himself of information supplied by AMMI, published sources of market data, and his personal knowledge as a collector. In sum, these actions satisfied the requirement of a good faith investigation. Because both conditions under section 6659(f)(2) have been satisfied, we find for petitioners on this issue. Sec. 6659(e).

To reflect the foregoing,

Decision will be entered under Rule 155.

Table 1
Inventory and Valuation of Leibowitz Donation

| Category | Dimensions (inches) | Accessioned Inventory | Nonaccessioned Inventory | Total Quantity | Category Price[1] | Category Total | Warren Valuation[3] | Everett Valuation |
|---|---|---|---|---|---|---|---|---|
| 1-sheet | 27 x 41 | 447 | 66 | 513 | $19 | $9,746 | $1,441.00 | $17,200 |
| 3-sheet | 41 x 81 | 294 | 12 | 306 | 157% | 9,128 | 759.50 | 16,740 |
| 6-sheet | 81 x 81 | 171 | 5 | 176 | 180% | 6,019 | 478.00 | 15,040 |
| 24-sheet | billboard | 45 | 3 | 48 | [2] | 83 | 83.00 | 16,200 |
| Half-sheet | 22 x 28 | 110 | 4 | 114 | 80% | 1,733 | 260.50 | 2,880 |
| Insert | 14 x 36 | 113 | 21 | 134 | 80% | 2,037 | 250.75 | 3,615 |
| Lobby card | 11 x 14 | 2,762 | 96 | 2,858 | 100% | 6,788 | 1,587.05 | 23,090 |
| Lobby card | 8 x 10 | 296 | 0 | 296 | 100% | 703 | [3] | 1,184 |
| B & W still | 8 x 10 | 1,709 | 0 | 1,709 | [2] | 189 | 188.94 | 5,127 |
| Color still | 9 x 12 | 18 | 0 | 18 | [2] | 5 | 4.50 | 90 |
| Lg. foreign | 47 x 62 | 262 | 187 | 449 | 75% | 6,398 | 445.00 | 25,795 |
| Med. foreign | 23 x 31 | 182 | 85 | 267 | 75% | 3,805 | 76.25 | 12,625 |
| Sm. foreign | 16 x 21 | 82 | 38 | 120 | 75% | 1,710 | 31.75 | 2,955 |
| Pressbook | various | 304 | 27 | 331 | 25% | 1,572 | 81.00 | 6,010 |
| Window card | 14 x 22 | 37 | 2 | 39 | 67% | 496 | 45.25 | 900 |
| Total | | 6,832 | 546 | 7,378 | | 50,412 | 5,733.49 | 149,451 |

[1] Percentage in this column is relative to the price of a one-sheet, whose average price is $19.

[2] The appraised value from Warren's report was used.

[3] Warren separately inventoried and priced two 15- by 31-inch items for 50 cents that were included elsewhere in the AMMI inventory and appraised the 8- by 10-inch lobby cards as black and white stills, although he did not include all of them in the appraised inventory.  Warren also did not exclude all the duplicates from his appraisal, which accounts for inconsistent counts of his inventory compared to the AMMI inventory.  There is also a further 50 cents unaccounted for.

Table 2
Reference Sample of 106 One-Sheets

| Title | Petr. Expert | Resp. Expert | Exact Match Price |
|---|---|---|---|
| Annie Hall | $20.00 | $1.00 | $20.00 |
| Attack | 20.00 | 10.00 | 40.00 |
| Audrey Rose | 20.00 | 1.00 | 12.50 |
| Bananas | 20.00 | 1.00 | 37.50 |
| Bank Shot | 20.00 | 1.00 | 25.00 |
| Barefoot Contessa | 100.00 | 8.00 | 75.00 |
| The Beachcomber | 20.00 | 10.00 | 10.00 |
| Beachhead | 20.00 | 10.00 | 10.00 |
| The Big Country | 60.00 | 30.00 | 35.00 |
| Black Tuesday | 20.00 | 15.00 | 30.00 |
| Breakheart Pass | 20.00 | 1.00 | 17.50 |
| A Bridge Too Far | 60.00 | 3.50 | 17.50 |
| Burnt Offerings | 20.00 | 1.00 | 17.50 |
| Bwana Devil | 200.00 | 10.00 | 75.00 |
| By Love Possessed | 60.00 | 1.00 | 22.50 |
| Captain Kidd and the Slave | 20.00 | 10.00 | 10.00 |
| Carrie | 40.00 | 1.00 | 25.00 |
| Cast a Giant Shadow | 80.00 | 1.00 | 25.00 |
| Chato's Land | 20.00 | 1.00 | 15.00 |
| Charge of the Light Brigade | 60.00 | 1.00 | 15.00 |
| Child is Waiting | 60.00 | 1.00 | 20.00 |
| The Children's Hour | 60.00 | 1.00 | 30.00 |
| Crime of Passion | 20.00 | 10.00 | 10.00 |
| Curse of the Faceless Man | 60.00 | 15.00 | 50.00 |
| The Defiant Ones | 20.00 | 30.00 | 12.00 |
| The Diamond Wizard | 20.00 | 10.00 | 10.00 |
| Diary of a Madman | 20.00 | 1.50 | 20.00 |

| Title | Petr. Expert | Resp. Expert | Exact Match Price |
|---|---|---|---|
| Doctor Blood's Coffin | 60.00 | 2.00 | 17.50 |
| Eight on the Lam | 20.00 | 1.00 | 35.00 |
| Enemy from Space | 60.00 | 15.00 | 40.00 |
| Ferry Across the Mersey | 60.00 | 1.00 | 25.00 |
| Flame Barrier | 20.00 | 10.00 | 40.00 |
| Follow That Dream | 100.00 | 1.00 | 40.00 |
| Foreign Intrigue | 20.00 | 10.00 | 45.00 |
| Four Days in November | 60.00 | 1.00 | 12.00 |
| Frankie and Johnny | 100.00 | 1.00 | 30.00 |
| The Fuzzy Pink Nightgown | 20.00 | 10.00 | 40.00 |
| Gator | 20.00 | 1.00 | 10.00 |
| Gun Brothers | 20.00 | 10.00 | 10.00 |
| A Hole in the Head | 60.00 | 15.00 | 12.00 |
| Huckleberry Finn | 20.00 | 1.00 | 10.00 |
| I Could Go On Singing | 100.00 | 1.00 | 30.00 |
| I, The Jury | 100.00 | 15.00 | 12.00 |
| Inherit the Wind | 60.00 | 2.00 | 20.00 |
| It, Terror From Beyond | 100.00 | 40.00 | 75.00 |
| Judgment at Nuremberg | 80.00 | 2.00 | 27.50 |
| The Kentuckian | 20.00 | 10.00 | 12.00 |
| King's Go Forth | 60.00 | 10.00 | 25.00 |
| The Lady Says No | 20.00 | 10.00 | 10.00 |
| Lilies of the Field | 60.00 | 1.00 | 30.00 |
| Live and Let Die | 100.00 | 2.00 | 40.00 |
| The Long Goodbye | 20.00 | 3.00 | 30.00 |
| Love and Death | 20.00 | 1.00 | 30.00 |
| Macumba Love | 20.00 | 1.00 | 17.50 |
| A Man and a Woman | 60.00 | 1.00 | 40.00 |
| The Man in the Net | 20.00 | 10.00 | 17.50 |
| The Man of La Mancha | 60.00 | 2.00 | 15.00 |
| The Manchurian Candidate | 60.00 | 1.00 | 25.00 |

| Title | Petr. Expert | Resp. Expert | Exact Match Price |
|-------|-----------|----------------|-------------------|
| The Missouri Breaks | 60.00 | 1.00 | 35.00 |
| Mister Moses | 20.00 | 1.00 | 15.00 |
| Moby Dick | 20.00 | 15.00 | 16.00 |
| Monster that Challenged | 60.00 | 25.00 | 50.00 |
| Mrs Pollifax-Spy | 20.00 | 1.00 | 20.00 |
| Ned Kelly | 60.00 | 2.00 | 40.00 |
| Network | 20.00 | 4.00 | 17.50 |
| New York, New York | 60.00 | 1.00 | 60.00 |
| Nightmare | 20.00 | 15.00 | 10.00 |
| The Offense | 20.00 | 1.00 | 10.00 |
| On Her Majesty's Secret Service | 100.00 | 5.00 | 50.00 |
| One, Two, Three | 60.00 | 1.00 | 40.00 |
| Patterns | 20.00 | 6.00 | 10.00 |
| Phantom From Space | 60.00 | 15.00 | 12.00 |
| Return to Treasure Island | 20.00 | 10.00 | 10.00 |
| The Road to Hong Kong | 60.00 | 1.00 | 20.00 |
| Rocky | 20.00 | 2.00 | 25.00 |
| Rollerball | 100.00 | 1.00 | 30.00 |
| Rosebud | 20.00 | 1.00 | 12.50 |
| Sabrejet | 20.00 | 10.00 | 10.00 |
| Sam Whiskey | 20.00 | 1.00 | 17.50 |
| The Satan Bug | 20.00 | 1.00 | 17.50 |
| Scorpio | 20.00 | 1.00 | 10.00 |
| Separate Tables | 60.00 | 15.00 | 35.00 |
| A Shot in the Dark | 20.00 | 1.00 | 35.00 |
| Sitting Bull | 20.00 | 5.00 | 10.00 |
| Skip Along Rosenblum | 20.00 | 10.00 | 12.00 |
| The Spy Who Loved Me | 100.00 | 1.00 | 20.00 |
| The Steel Lady | 20.00 | 20.00 | 10.00 |
| Storm Fear | 20.00 | 10.00 | 15.00 |

| Title | Petr. Expert | Resp. Expert | Exact Match Price |
|---|---|---|---|
| Stolen Hours | 20.00 | 2.00 | 20.00 |
| Streetcar Named Desire | 100.00 | 60.00 | 137.50 |
| Sweet Smell of Success | 20.00 | 10.00 | 12.00 |
| The Thomas Crown Affair | 60.00 | 2.00 | 35.00 |
| Thunder Road | 100.00 | 75.00 | 35.00 |
| Thunderbolt & Lightfoot | 100.00 | 4.00 | 35.00 |
| Tom Sawyer | 20.00 | 1.00 | 10.00 |
| Top of the World | 20.00 | 10.00 | 10.00 |
| Tower of London | 60.00 | 1.00 | 30.00 |
| Twice Told Tales | 60.00 | 1.00 | 17.50 |
| U.F.O. | 20.00 | 15.00 | 10.00 |
| We Want a Child | 20.00 | 10.00 | 10.00 |
| What's New Pussycat? | 20.00 | 1.00 | 40.00 |
| Where's Poppa | 20.00 | 1.00 | 17.50 |
| White Lightning | 20.00 | 2.00 | 12.50 |
| Witness for the Prosecution | 100.00 | 25.00 | 30.00 |
| Woman of Straw | 60.00 | 1.00 | 25.00 |
| Wonderful World of Henry Orient | 20.00 | 1.00 | 25.00 |
| Total | 4,760.00 | 782.00 | 2,697.00 |
| Average | 44.91 | 7.38 | 25.44 |
| Lowest price | 20.00 | 1.00 | 10.00 |
| Highest price | 200.00 | 75.00 | 137.50 |